# 16-0474-cv

## United States Court of Appeals

*for the*

## Second Circuit

MARLON PENN,

*Plaintiff-Appellant,*

– v. –

NEW YORK METHODIST HOSPITAL, PETER POULOS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

VINCENT IHEKE EKE-NWEKE
LAW OFFICE OF VINCENT I. EKE-NWEKE, P.C.
*Attorney for Plaintiff-Appellant*
498 Atlantic Avenue
Brooklyn, New York 11217
(718) 852-8300

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF SUBJECT MATTER AND APPELLATE
    JURISDICTION ...........................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................2

STATEMENT OF FACTS ....................................................................4

    A.    THE COMPLAINT AND CLAIMS ASSERTED THEREIN .............4

    B.    PENN'S BACKGROUND AND DURATION OF
        EMPLOYMENT WITH NYMH .........................................5

    C.    PETER POULOS ..................................................6

    D.    NYMH WAS NOT FOUNDED BY THE METHODIST
        CHURCH .........................................................6

    E.    IN 1975 NYMH AFFIRMATIVELY SEVERED ITS
        ALLEGED RELATIONSHIP WITH THE UNITED
        METHODIST CHURCH ................................................7

    F.    NYMH PUBLICLY STATED IT WAS A SECULAR
        INSTITUTION .....................................................9

        1.    NYMH's Website Stated That It Was A Secular
            Institution .....................................................9

        2.    NYMH Was A Member of The NewYork-Presbyterian
            Healthcare System And A Non-Sectarian Voluntary
            Institution .....................................................9

        3.    NYMH Was Not Affiliated With Any Unit of The
            Methodist Church.................................................10

    G.    ALLEGED "TRADITIONAL AFFILIATION" OF NYMH .............11

    H.    BASIS FOR THE ALLEGED "TRADITIONAL
        AFFILIATION" WITH THE UNITED METHODIST
        CHURCH .........................................................11

1.    Only Three Out of Seventeen Members of The Board of Trustees Were Alleged To Be Methodist Ministers ............ 13

2.    The Mission of The Department Was Secular, Not Religious ................................................................ 14

I.    DEFENDANTS' PRE-ANSWER MOTION TO DISMISS ............. 16

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT .............................. 17

1.    Hill Lacked Personal Knowledge of NYMH's Alleged By-Laws ................................................................ 18

2.    The Health and Welfare Certification Council of The United Methodist Church Was Defunct In The 1990s .................................... 18

THE ORDER AND JUDGMENT APPEALED FROM ......................... 19

SUMMARY OF ARGUMENT ................................................ 20

ARGUMENT ............................................................... 23

THE STANDARD OF REVIEW IS *DE NOVO* ........................... 23

POINT I

THE COMPLAINT WAS NOT BARRED BY EITHER THE FIRST AMENDMENT, OR RFRA NOR BY TITLE VII EXEMPTION BECAUSE NYMH WAS A "PERVASIVELY SECULAR" INSTITUTION NOT A "RELIGIOUS INSTITUTION" ............................................................ 24

A.    THE BURDEN OF PROOF WAS ON THE DEFENDANTS TO ESTABLISH THAT NYMH WAS A "RELIGIOUS INSTITUTION" ........................................................... 25

B.    COURTS APPLY THE SAME STANDARD UNDER THE FIRST AMENDMENT, RFRA AND TITLE VII TO DETERMINE WHETHER AN ENTITY IS A "RELIGIOUS INSTITUTION" ........................................................... 26

C.    STANDARD FOR DETERMINING WHETHER AN ENTITY IS A "RELIGIOUSLY-AFFILIATED" ENTITY .............. 28

1.    Balancing Test By Weighing Religious Characteristics Against Secular Characteristics ................................ 28

ii

2. "Substantial Religious Character" Test Based On Founding And Ownership, Operation And/or Control By A Traditional Religious Organization ................................. 31

3. "Substantial Religious Character" Test Based Upon Specific "Religious Purpose" As Set Forth In Foundational Document ............................................................ 33

D. NYMH LACKED A "SUBSTANTIAL RELIGIOUS CHARACTER" .................................................................................. 35

1. NYMH Had A Pervasively Secular Character Not A "Substantial Religious Character" ............................................ 39

2. Historical Ties To Methodism Is Not Synonymous With "Substantial Religious Character" .................................. 41

3. Alleged Pastor's Clinic And Philanthropic Appeal Were Secular Humanitarian Or Charitable Activities, Not Religious ............................................................................. 42

4. Chaplaincy And CPE Programs Served A Secular Purpose, Not Religious ............................................................. 43

5. Chaplain Duties Were Insufficient To Give NYMH "Substantial Religious Character" ............................................ 45

POINT II

THE DISTRICT COURT MISAPPREHENDED THE IMPORT OF THE *DICTA* IN THE CASES OF <u>MUSANTE</u>, <u>RWEYEMAMU</u>, AND <u>SCHARON</u> ........................................................................................ 47

A. THE DISTRICT COURT IMPROPERLY APPLIED THE *ORBITER DICTA* IN THE CASES OF <u>MUSANTE</u> AND <u>RWEYEMAMU</u> ............................................................................... 47

B. THE DISTRICT COURT IMPROPERLY ANALOGIZED NYMH TO ST. LUKE'S HOSPITAL IN <u>SCHARON</u> ...................... 50

iii

POINT III

THE DISTRICT COURT FAILED TO CONSIDER THE
EVIDENCE IN THE RECORD IN THE LIGHT MOST
FAVORABLE TO PENN AND FAILED TO GIVE PENN THE
BENEFIT OF ALL REASONABLE INFERENCES FROM SUCH
EVIDENCE ................................................................................................54

POINT IV

THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT TO DEFENDANTS BASED IN PART ON
INADMISSIBLE EVIDENCE ....................................................................56

CONCLUSION .....................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Allianz Ins. Co. v. Lerner,
    416 F.3d 109 (2d Cir. 2005) ...........................................................................54

Arneauld v. Pentair, Inc.,
    CV-113891(SJF)(ETB), 2012 U.S. Dist. LEXIS 168185
    (E.D.N.Y. Nov. 26, 2012)................................................................................56

Boniel v. U.S. Bank N.A.,
    No. 12-CV-3809, 2013 U.S. Dist. LEXIS 16247
    (E.D.N.Y. Feb. 6, 2013) .................................................................................58

Carlton v. Mystic Transportation, Inc.,
    202 F.3d 129 (2d Cir. 2000) ...........................................................................23

Carter v. Broadlawns Medical Ctr.,
    857 F.2d 448 (8th Cir. 1988), cert. denied, 489 U.S. 1096,
    109 S. Ct. 1569, 103 L. Ed. 2d 935 (1989).....................................................44

DeMarco v. Holy Cross High Sch.,
    4 F.3d 166 (2d Cir. 1993) ...............................................................................26

EEOC v. Catholic Univ. of Am.,
    83 F.3d 455 (D.C. Cir. 1996)..........................................................................32

EEOC v. Kamehameha Schools,
    990 F.2d 458 (9th Cir. 1993) ...................................................................*passim*

EEOC v. Kamehameha Schools/Bishop Estate,
    780 F. Supp. 1317 (D. Haw. 1991)..................................................................29

EEOC v. Mississippi College,
    626 F.2d 477 (5th Cir. 1980) ..........................................................................33

EEOC v. Presbyterian Ministries,
    788 F. Supp. 1154 (W.D. Wash. 1992) ...........................................................33

EEOC v. Townley Eng'g & Mfg. Co.,
    859 F.2d 610 (9th Cir. 1988) ...................................................................*passim*

FDIC v. Wrapwell Corp.,
    93 Civ. 859, 2002 U.S. Dist. LEXIS 76 (S.D.N.Y. Jan. 3, 2002) .................57

Fike v. United Methodist Children's Home of Va., Inc.,
    547 F. Supp. 286 (E.D. Va. 1982), aff'd,
    709 F.2d 284 (4th Cir. 1983) ............................................38, 41, 43

Fincher v. Depository Trust & Clearing Corp.,
    604 F.3d 712 (2d Cir. 2010) ........................................................54

Fitzgerald v. Henderson,
    251 F.3d 345 (2d Cir. 2001) ........................................................26

Graham v. Long Island Rail Road,
    230 F.3d 34 (2d Cir. 2000) ..........................................................23

Grand Rapid School Dist. v. Ball,
    473 U.S. 373, 105 S. Ct. 3216 (1985) ...........................................53

Hall v. Baptist Mem. Health Care Corp.,
    215 F.3d 618 (6th Cir. 2000) ........................................................32

Hankins v. Lyght,
    441 F.3d 96 (2d Cir. 2006) ..........................................................26

Hartwig v. Albert Magnus College,
    93 F. Supp. 2d. 200 (D. Conn. 2000) ...........................................25

Hollins v. Methodist Healthcare, Inc.,
    474 F.3d 223 (6th Cir. 2007) ........................................................27

Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,
    132 S. Ct. 694, 181 L. Ed. 2d 650 (2012)...........................24, 25, 26

Killinger v. Samford Univ.,
    113 F.3d 196 (11th Cir. 1997) ......................................................32

Lachira v. Sutton,
    No. 3:05-CV-1585, 2007 U.S. Dist. LEXIS 33250
    (D. Conn. May 7, 2007)...............................................................57

Leboon v. Lancaster Jewish Cmty. Ctr. Assoc.,
    503 F.3d 217 (3d Cir. 2007) ............................................30, 31, 36

Lemon v. Kurtzman,
    403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971) ........................*passim*

Little v. Wuerl,
    929 F.2d 944 (3d Cir. 1991) ........................................................33

vi

Malyon v. Pierce County,
      935 P.2d 1272, 131 Wash. 2d 779 (Wash. Sup. Ct. 1997)...........................44

Musante v. Notre Dame of Eastern Church,
      No. 301CV2352 (MRK), 2004 U.S. Dist. LEXIS 5611
      (D. Conn. Mar. 30, 2004) .......................................................*passim*

Patterson v. County of Oneida, New York,
      375 F.3d 206 (2d Cir. 2004) .........................................................56

Penn v. New York Methodist Hosp.,
      No. 11-cv-9137 (NSR) 2013 U.S. Dist. LEXIS 142109
      (S.D.N.Y. Sept. 30, 2013)......................................................*passim*

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
      582 F.3d 244 (2d Cir. 2009) .........................................................56

Rweyemamu v. Cote,
      520 F.3d 198 (2d Cir. 2008) ...................................................*passim*

Saks International, Inc. v. M/V "Export Champion,"
      817 F.2d 1011 (2d Cir. 1987) .......................................................57

Salve Regina College v. Russel,
      499 U.S. 225, 113 L. Ed. 2d 190, 111 S. Ct. 1217 (1991) ...........................23

Scharon v. St. Luke's Episcopal Presbyterian Hosp.,
      736 F. Supp. 1018(E.D. M. 1990), aff'd,
      929 F.2d 360 (8th Cir. 1991) ...................................................*passim*

Scotto v. Brady,
      410 Fed. Appx. 355 (2d Cir. 2010) .................................................57

Shaliehsabou v. Hebrew Home of Greater Wash., Inc.,
      363 F.3d 299 (4th Cir. 2004) ...........................................27, 33, 34

Shamrock Power Sales, LLC v. Scherer,
      No. 12-CV-8959, 2015 U.S. Dist. LEXIS 133650
      (E.D.N.Y. Sept. 30, 2015) ..........................................................58

Spencer v. World Vision, Inc.,
      633 F.3d 723 (9th Cir. 2011) ...........................................29, 30, 36

St. Elizabeth Community Hosp. v. NLRB,
      708 F.2d 1436 (9th Cir. 1983) ................................................*passim*

United States v. Diebold, Inc.,
    369 U.S. 654 (1962)...................................................................54

Zervos v. Verizon N.Y., Inc.,
    252 F.3d 163 (2d Cir. 2001) .......................................................23

**Statutes & Other Authorities:**

First Amendment to the U.S. Constitution .......................................*passim*

28 U.S.C. § 1291...........................................................................1

42 U.S.C. § 1981...........................................................................1

42 U.S.C. § 2000bb-1 ...........................................................*passim*

42 U.S.C. § 2000e ................................................................*passim*

42 U.S.C. § 2000e-1 ....................................................................42

42 U.S.C. § 2000e-1(a) ..........................................................25, 26

Administrative Code of the City of New York, § 8-101 .........................1

Executive Law § 290......................................................................1

N.Y. Relig. Corp. Law § 2 .............................................................35

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

By his Second Amended Complaint ("Complaint"), Plaintiff-Appellant Marlon Penn ("Plaintiff" or "Penn") asserted claims against the Defendants-Appellees New York Methodist Hospital ("NYMH") and Peter Poulos ("Poulos") (together "Defendants" or "Appellees"), among other things, for discrimination and desperate treatment on the basis of race and religion in the terms, conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.,* ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981") as well as retaliation claims in violation of the Title VII, § 1981, the New York State Human Rights Law, Executive Law § 290 *et seq.* and the Administrative Code of the City of New York, § 8-101 *et seq* (A234-249).

Penn appeals from opinion and order of the United States District Court for the Southern District of New York (Román, USDJ), dated January 20, 2016 (SPA1-12) as well as judgment dated January 21, 2016 (SPA13), which granted Defendants' Motion for Summary Judgment on the grounds that Penn's claims were barred by the Free Exercise and Establishment Clauses of the First Amendment. On February 18, 2016, Penn filed a timely Notice of Appeal from said opinion and order and judgment to this Court (A507). This Court has appellate jurisdiction because the opinion and order and the judgment are "final decisions" within the meaning of 28 U.S.C. § 1291.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

The issues presented in this appeal are as follows:

1.      Whether the District Court erred in finding "sufficient indicia of religious affiliation to create a First Amendment issue" and in granting Defendants' motion for summary judgment where the record is devoid of evidence that NYMH had "substantial religious character" particularly, in light of the fact that (a) the District Court recognized that in 1975 NYMH severed all formal ties with The United Methodist Church, (b) it was undisputed that in 1975 the NYMH amended its "purpose" as set forth in its restated certificate of incorporation by deleting the requirement that NYMH shall maintain its "Christian genesis", "Church related character" and "relationship with The United Methodist Church", (c) it was undisputed that the <u>only</u> purpose of NYMH was to "establish, maintain, operate and conduct a hospital" for the provision of health care services -- a secular humanitarian service -- (d) it was  undisputed that NYMH's website stated that NYMH is "now a secular institution", (e) the District Court noted that "NYMH may be primarily a secular institution," (f) NYMH was not affiliated with any church or religious organization, and (h) it was undisputed that the NYMH was affiliated with notoriously known secular institutions under the same umbrella as NewYork-Presbyterian Healthcare System.

2

2.      Whether the District Court erred in relying on *orbiter dicta* in the cases of <u>Musante v. Notre Dame of Eastern Church</u>, No. 301CV2352 (MRK), 2004 U. S. Dist. LEXIS 5611 (D. Conn. Mar. 30, 2004), <u>Rweyemamu v. Cote,</u> 520 F. 3d 198 (2nd Cir. 2008), and <u>Scharon v. St. Luke's Episcopal Presbyterian Hosp</u>., 929 F. 2d 360 (8th Cir. 1991) to grant summary judgment to the Defendants where each of those cases involved an employer-defendant that was unquestionably a "religious institution" or was found to have a "substantial religious character" whereas NYMH lacked a "substantial religious character."

3.      Whether the District Court erred in failing to consider the evidence in the record in the light most favorable to Penn and failed to give Penn the benefit of all reasonable inferences from such evidence.

4.      Whether the District Court erred in crediting speculative deposition testimony by Defendants' witnesses and in crediting the purported By-laws of NYMH when such By-laws was neither signed nor authenticated.

## STATEMENT OF FACTS[1]

**A. THE COMPLAINT AND CLAIMS ASSERTED THEREIN**

On December 12, 2011, Penn filed a complaint *pro se* in the United States District Court for the Southern District of New York against both Defendants (A196-233, 250 at ¶5). The Complaint, *inter alia* asserted federal and state claims for discrimination, desperate treatment and retaliation on the basis of race and religion in the terms, conditions, and privileges of employment (A234, 247-249). Among other things, the Complaint alleged that NYMH, by and through Poulos -- then Penn's supervisor -- discriminatorily denied Penn promotion. That as a consequence of the denial of promotion, Penn filed a charge of race and religious discrimination against Defendants with the New York City Commission on Human Rights. That in retaliation for filing said charge, Defendants issued Penn with unwarranted and unjustified write-ups, disciplinary charges or notices, procured a female co-worker to fabricate a complaint of sexual harassment against Penn and ultimately terminated Penn's employment on or about December 6, 2011 (A237 ¶24, 240 -246).

---

[1]Because the District Court did not reach the merits of the discrimination and retaliation claims asserted in the Complaint, the Statement of Facts herein is limited to the facts relevant to issues presented on appeal. Penn respectfully refers to the Complaint (A234-249) and Statement of Disputed Material Facts submitted pursuant to pursuant to Local Civil Rule 56.1(b) for a complete recitation of the factual details of his case (A428-506 )

**B.     PENN'S BACKGROUND AND DURATION OF EMPLOYMENT WITH NYMH**

Penn began his career with the NYMH in about January 2002, as a Chaplain Trainee (also referred to as Chaplain Resident or Student Chaplain) at the Clinical Pastoral Education ("CPE") Residency Program at NYMH (A251 at ¶6, 438 at ¶19). Penn completed said CPE Residency Program in August 2003, having acquired 5 Units of CPE.  Upon completion of the CPE Residency Program, NYMH employed Penn as a temporary employee in the position of Staff Chaplain in its Pastoral Care Department ("Department") beginning from approximately August 2003 to June 2004 (A251 at ¶¶7-8).  From July 2004 through December 6, 2011, NYMH permanently employed Penn as a  part-time Staff Chaplain in the Department (A252 at ¶10).

Before Penn began his employment with NYMH, he had earned both Associate's and  Bachelor's of Science degrees in 1983 as well as a Master of Arts degree in 1985.  Also, Penn obtained one unit of Intensive CPE in the year 2000 from Westchester Medical Center, Valhalla, New York.  In addition, during the course of Penn's employment with NYMH, Penn on his own volition, earned and was issued with the following certifications or degrees: Community Service Ministries Chaplaincy Basic Training Course in January 2006, by Church of God Chaplains Commission; Spirituality & Healing in Medicine in December  2007, by Harvard

5

Medical School, Department of Continuing Education; Master of Divinity and Doctor of Ministry in 2008 and 2010 respectively by New York Theological Seminary; and was Board Certified as a chaplain in January 2011, by the Board of Chaplaincy Certification Inc (A251 at ¶ 7(a)-(j)).

Further, sometime in 2007, Penn was ordained as a minister. It is important to note that Penn sought ordination voluntarily. His ordination was unrelated to any employment requirement at NYMH. No one at NYMH asked or suggested to Penn to seek ordination. Indeed, throughout the duration of Penn's career at NYMH ordination was not a requirement for employment or chaplaincy at NYMH (A252 at ¶ 10, 369 at pg. 340 lns. 16-23, 437 at ¶¶ (a)-©).

## C.   PETER POULOS

At all relevant times Poulos was Penn's supervisor and the Director of the Department since 1990. Also, Poulos was the Director of the CPE program since 1979. Importantly, Poulos was not Methodist. Rather, he was and presumably still is a Greek Orthodox Christian (A358 pg. 8 lns. 2-13, 360 pg. 53 lns. 6-14).

## D.   NYMH WAS NOT FOUNDED BY THE METHODIST CHURCH

In about 1881, as a result of encouragement by Reverend Dr. James Buckley, then a pastor at the Methodist Episcopal Church in Stamford, Connecticut, a Brooklyn, New York, successful Gilded Age banker, George Ingraham Seney – the

6

primary financial "founding father" of NYMH -- provided funding for founding of NYMH on the condition that NYMH be "a GENERAL HOSPITAL, open to Jew and Gentile, Protestant and Catholic, Heathen and Infidel, on the same terms" (A322).

In connection with the commemoration of NYMH's 125 years of service, NYMH publicly acknowledged that it is an institution founded to be "a general Hospital and open to the sick of all lands and colors and creeds" with a spirit "so liberal that the doors shall be thrown wide open to any human being that God Almighty permits to live anywhere on the face of his earth" (A323).

## E. IN 1975 NYMH AFFIRMATIVELY SEVERED ITS ALLEGED RELATIONSHIP WITH THE UNITED METHODIST CHURCH

The Restated Certificate of Incorporation of NYMH filed with the New York Department of State in or about December 1973, stated as follows in relevant parts:

The text of the Restated Certificate of Incorporation for [NYMH] as heretofore and hereby amended reads as follows:

"2. The purpose of the corporation is to establish, maintain, operate and conduct a hospital, including an infirmary, dispensary, or clinic, for the medical and surgical aid, care and treatment of persons in need thereof. The corporation in maintaining its Christian genesis and its Church related character in the performance of its functions shall nurture a meaningful and effective relationship with The United Methodist Church and its participating boards, institutions

7

<u>and congregations</u>. (emphasis added)

(A258)

> "6. The said board of trustees shall consist of forty trustees divided into four classes of nine trustees each and in addition, four trustees, ex-officio, consisting of the following: the Bishop of New York Area of The United Methodist Church, ... and the President of Guild of Methodist Hospital.

(A259)

However, in 1975 the express provisions of the Restated Certificate of Incorporation of NYMH filed with the State of New York Department of State on or about January 22, 1975, unambiguously abolished NYMH's alleged religious purpose and completely severed its alleged historical relationship with The United Methodist Church, as follows:

> 3. The certificate of incorporation, as heretofore amended, is further amended (a) to delete provisions relating to the corporation's relationship with The United Methodist Church and (b) to change the number of trustees from forty to thirty-eight by deleting the requirement that the Bishop of the New York area of The United Methodist Church and the President of the Guild of Methodist Hospital be trustees, ex-officio.

(A269)

4. The text of the Restated Certificate of Incorporation for [NYMH] as heretofore and hereby amended reads as follows:

8

"2. The purpose of the corporation is to establish, maintain, operate and conduct a hospital, including an infirmary, dispensary, or clinic, for the medical and surgical aid, care and treatment of persons in need thereof.

(A269-270)

## F.  NYMH PUBLICLY STATED IT WAS A SECULAR INSTITUTION

### 1.  NYMH's Website Stated That It Was A Secular Institution

After NYMH severed relationship with The United Methodist Church, it consistently stated publicly that it was a secular institution and continues to state that it is now a secular non-sectarian institution.  Specifically, NYMH's Publication entitled Residency Program in Internal Medicine evidently published between 2013 and 2014[2] (A340, 347-348 at Response 1) as well as the "Welcome Letter" published on NYMH's website (http://www.nym.org.) (A353-354) both stated and continues to state that NYMH is now a secular institution.

### 2.  NYMH  Was A Member of The NewYork-Presbyterian Healthcare System And A Non-Sectarian Voluntary Institution

Also, the Mission Statement of NYMH as published to the general public and to the employees of NYMH stated and continues to state that NYMH is "a member of the NewYork-Presbyterian Healthcare System" and that it is "a non-sectarian,

---

[2]The document appears to be undated. However, it notes at A339 that Dr. Dosik was chair of medicine at NYMH from 1995-2013.  Which suggests the document was published between 2013 and 2014. (A339)

9

voluntary institution, which includes an acute care general facility and an extensive array of ambulatory and outpatient sites and services" (http://www.nym.org.) (A67, 407, 410). It is a notorious fact that NewYork-Presbyterian Healthcare System was and still is a secular institution comprised of secular entities (www.nypsystem.org).

### 3. NYMH Was Not Affiliated With Any Unit of The Methodist Church

Further, the UMA Journal article apparently published in October 1994 (A109) relied upon in this case by NYMH clearly stated in relevant parts that NYMH was not formally affiliated with a connectional unit of the United Methodist Church (A343, 347-348 at Response No. 2). Also, by email dated November 13, 2014, the United Methodist Information Service noted that the relationship between NYMH and the United Methodist Church is primarily historical in nature (A324).

In addition, the United Methodist Association of Health and Welfare Ministries (UMA) internet material (A330 at ¶ 2500 (4)), made clear that in order for any unit of the United Methodist Church to maintain a relationship with a health and welfare organization such as NYMH, the legal and financial relationship between the Church and such organization must be memorialized in a clearly stated document described as a Relationship Statement, stating the terms of such relationship. In this case, Defendants by their Response to Plaintiff's Request to Admit Nos. Nos. 6-12, admitted that NYMH did not maintain any Relationship Statement with any unit of

10

the United Methodist Church (A349-351).

## G.     ALLEGED "TRADITIONAL AFFILIATION" OF NYMH

Notwithstanding that in January 1975, NYMH "affirmatively" abolished its alleged religious purpose, completely severed "its Christian genesis", "Church related character" and alleged relationship with The United Methodist Church and that it publicly proclaimed that it was a secular institution, Defendants alleged in this case that although NYMH ceased to be corporately owned and administered by the Methodist Church in the twentieth century, it allegedly retained "a traditional affiliation" with the Methodist Church (A383 at pgs. 23-24 lns. 17-11, 384 pg. 25 lns. 21-24, 386 at pgs. 35-36 lns. 20-11).

## H.     BASIS FOR THE ALLEGED "TRADITIONAL AFFILIATION" WITH THE UNITED METHODIST CHURCH

Defendants identified the following employees of NYMH as persons with knowledge or information about the alleged "traditional" or religious affiliation of NYMH: Poulos, a Greek Orthodox Christian (360 pg. 53 lns. 6-14); Lyn Hill ("Hill"), Jewish, Vice President for Communications and External Affairs who was also responsible for the Department and had worked at NYMH for twenty-seven years (A379 at pgs. 5 lns. 20-25, 7 lns. 18-25, 383 pg. 23 lns. 5-16, 385 pg. 30 lns. 2-6); and Dennis Buchanan ("Buchanan"), non-Methodist, NYMH's Vice President for Human

11

Resources (A403 pgs. 6-9, 415).

Based on the combined testimonies of Poulos, Hill and Buchanan, Defendants claimed that NYMH was a religiously affiliated entity because the following allegations show that it retained alleged "traditional affiliation" with the United Methodist Church: (1) NYMH was the first Methodist hospital ever established, was known as the mother hospital of Methodism in the United Methodist Church, was founded in 1881 at the behest of a Methodist minister and funded by a Methodist philanthropist and was administered by the Methodist Church until sometime in the twentieth century when it ceased to be owned by the Methodist Church (A361 pgs. 88-89, A383 pgs. 23-24); (2) NYMH ran a pastor's clinic several times a year where Methodist ministers were provided free health screening for a week and it made yearly philanthropic appeal to Methodist Churches in its area (A383 pg. 24 lns. 12-19, A384 pgs. 28-31 A392-393 pgs. 58-62); (3) Several members of the board of trustees of NYMH, including the chairman were Methodist ministers and board meetings began with prayer (A362 pg. 89 lns. 2-3, A383 pgs. 24-25 lns. 19-3, A388-390 pgs. 42-52, A400 pgs. 38-43); (4) When in 1993, NYMH affiliated with New York-Presbyterian Healthcare System, there was a decision to keep the word "Methodist" in the name of NYMH so that the "traditional affiliation" would not be forgotten (A384 at pg. 25 lns. 4-20); and (5) NYMH provided chaplaincy services and CPE

12

(A362 pgs. 90-92, A384 pgs. 26-27).

### 1. Only Three Out of Seventeen Members of The Board of Trustees Were Alleged To Be Methodist Ministers

The Board of Trustees of NYMH had approximately seventeen individual members. Only three out of said seventeen individuals were alleged to be Methodist ministers. But none of the three individuals represented the church on said Board. The three individuals in question did not represent the church on the Board. The three alleged Methodist minsters were, Reverend Carrington (chairman), Reverend Simpson and Reverend McLee, deceased (A388-390 pgs. 42-52, A400 pg. 40 at 4-15, A414). In fact, Defendants formally admitted that both Reverend Carrington and Reverend Simpson did not represent any unit of the United Methodist Church on the Board of Trustees of NYMH (A351 at Nos. 14-16). Also, Buchanan did not know who, when or how Reverend Simpson and Reverend[3] McLee, deceased, were nominated to be appointed to the Board of Trustees of NYMH (A401 at pgs. 41, 42 lns. 22-25, A402 pgs. 46-47)

With respect to Reverend Carrington, Hill did not know the circumstances under which he was appointed to the Board. (A388 pgs. 42-44). Buchanan testified

---

[3]Despite repeated requests by Plaintiff, Defendants failed to produce any documentary evidence regarding the circumstances and capacity each of the alleged three ministers were members of the Board of Trustees of NYMH (A419-420 at ¶¶ 19-22, 31, A426 at ¶¶ 19-22, 31)

13

that Reverend Carrington had been the chairman of the Board of Trustees at least since 1990 but that he did not know the circumstances under which he became the chairman of the Board and did not know whether he was nominated to be on the Board by any unit of the United Methodist Church. At the time, Reverend Carrington was well over eighty years of age and had been retired for a good number of years. (A400 pg. 39 lns. 4-15, 401 pgs. 41-42 lns. 23-21).

### 2.     The Mission of The Department Was Secular, Not Religious

Like most secular hospitals, NYMH had a CPE program as well as the Department which  provided chaplaincy services to NYMH's patients, their families and staff (A406, 409).  As published on the NYMH's website, the Department's mission was "[t]o see that the needs of the whole person-mind and spirit as well as body-are met, [NYMH] has chaplains available 24 hours a day for spiritual and emotional support for all patients staying at the Hospital"[4] (www.nym.org) (A356). The only requirements for chaplain position at NYMH were, M. Div. or equivalent and four units of CPE at any accredited CPE training center (A368 at pg. 214 lns. 2-9, 411).

---

[4]Contrastingly, the VA at its NY Harbor Healthcare System runs a clinical education program and  Chaplain Service department which "offers spiritual & religious care for "Veterans, their families and loved ones and VA staff."  (http://www.va.gov/services/chaplain_service.asp; A374 at pgs. 17-18 lns. 16-11, 375 at pg. 43 lns. 2-20)

Poulos emphasized to chaplains employed at the NYMH that the Department's ministry was spiritual and not based on religion. Poulos always insisted that chaplains should let patients know that NYMH was not a church but a hospital -- if any patient wanted more from a chaplain the patient should contact his or her home minister or congregation (A253 at ¶ 36, 437 at ¶ 14(a) and (b)).

As Poulos testified at his deposition in this case, most secular hospitals[5] have a pastoral care department. Poulos was unaware of any hospital -- whether secular or religious -- that did not have a pastoral care department. (A362 at pgs. 91-92 lns 21-20). Indeed, several chaplains employed at NYMH around the same time as Penn trained or were certified as chaplains at the clinical pastoral education program at the United States Department of Veteran Affairs ("VA") Manhattan Medical Center (A370 at pg. 378 lns. 7-11, 374 at pgs. 17-18 lns. 16-11, 375 at pg. 43 lns. 2-20).

In connection with its pastoral care services, NYMH also maintained at its premises, a Moslem Prayer Room, Jewish Prayer Room as well as a Chapel for Christians (A80) and also employed or retained the services of chaplains of different religious creed at the Department, including but not limited to Moslem, Orthodox Jewish, Catholic, Jehovah's Witness, Methodist and Seventh Day Adventist

---

[5] Poulos defined "secular hospital" as "[n]ot church connected or religious connected." (A365 at pg. 103 lns. 3-6)

15

chaplains (A363 at pgs. 95-96 lns. 2-10).

## I.    DEFENDANTS' PRE-ANSWER MOTION TO DISMISS

Defendants filed a pre-answer Motion to Dismiss Penn's Complaint and argued *inter alia,* that the Complaint was barred by the First Amendment under the doctrine of ministerial exception and the Religious Freedom and Restoration Act (the "RFRA").  By Opinion and Order dated September 30, 2013 (A7-34), the District Court granted in part and denied in part the Motion to Dismiss. *See* <u>Penn v. New York Methodist Hosp</u>*.,* No. 11-cv-9137 (NSR) 2013 U.S. Dist. LEXIS 142109 (S.D.N.Y. Sept. 30, 2013).

The District Court held that in order for the doctrine of ministerial exception to apply to this action, it must be established that (1) Penn was employed as a ministerial employee, <u>Id</u>. at *13, and (2) NYMH was "a religious or religiously-affiliated group or institution" <u>Id</u>. at *19.  The District Court found that Penn was a "ministerial employee." <u>Id</u>. at *17.  However, in denying Defendants' Motion to Dismiss, the District Court concluded that the "ministerial exception" and RFRA were inapplicable to this case because "Defendants [had] not demonstrated that NYMH [was] a religious institution or religiously-affiliated." <u>Id</u>. at *26, 30.

16

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[6]

Following the completion of pretrial discovery, Defendants moved for summary judgment and again argued that Penn's Complaint was barred by the First Amendment ("ministerial exception") and RFRA. Having amended their Answer to the Complaint and added additional affirmative defense under Section 702 of Title VII, Defendants further argued that NYMH was allegedly a "religious institution" within the meaning of Title VII and therefore was exempt under section 702 of Title VII from the discrimination and retaliation claims asserted in the Complaint.

In support of their Motion for Summary Judgment, Defendants among other things, submitted an affidavit allegedly sworn to by Hill (A41-43) which affidavit purported to authenticate certain documents, including but not limited to, Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories (A45-62); NYMH's alleged Bylaws (A84-106); Article published in 1994 (approximately ten years before Penn began his employment with NYMH) in the UMA Journal, Vol. No. 8 (1994) (A108-110); excerpts from 1980 Annual Report of the Methodist Hospital (A112-113) and The Health and Welfare Certification Council of The United

---

[6]Apparently Defendants were convinced that NYMH was not a "religious institution." Therefore, by their request for a pre-motion conference (A427 at n. 1) Defendants represented to the District Court that they did not intend to move for summary judgment on the alleged ground that NYMH was a religious institution. However, Defendants reneged on said representation and moved for summary judgment on the ground that NYMH was allegedly a religious institution.

17

Methodist Church to Methodist Hospital of Brooklyn dated May 21, 1982 (A115).

### 1. Hill Lacked Personal Knowledge of NYMH's Alleged By-Laws

Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories ("Response to Interrogatories") (A45-62) apparently verified by Hill, contained certain information Hill had testified she had no personal knowledge about. For instance, Hill testified that she was not familiar with NYMH's Bylaws, had never read it and was unable to authenticate[7] the Bylaws. (A391 pgs. 54-55). However, Response to Interrogatories No. 3, allegedly verified by Hill, quoted extensively from the purported Bylaws (A56) notwithstanding that Hill was unable to authenticate the By-Laws and Defendants had failed, despite repeated requests (A422 at last ¶), to produce executed or authenticated copy of the Bylaws.

### 2. The Health and Welfare Certification Council of The United Methodist Church Was Defunct In The 1990s

As noted by the United Methodist Information Service, the council known as "The Health and Welfare Certification Council of The United Methodist Church" was no longer in existence during Penn's employment at the NYMH. The council was defunct having changed in the 1990s to "United Methodist Association of Health and Welfare Ministries" and then further changed to "United Methodist Association

---

[7]Poulos also testified that he was not familiar with the provisions of the By-Laws of the NYMH's (A367 at pgs. 109-110 lns. 13-19)

18

(A108, 325, 326 at ¶5) (http://www.umassociation.org). At their deposition, Poulos, Hill and Buchanan each denied knowledge about the existence of any council known as "The Health and Welfare Certification Council of The United Methodist Church." (A366 at pg. 108, A393 at pg. 63, A403-404 at pgs. 52-53 lns. 22-5, 55 lns. 2-19). Also, Defendants formally responded that they were "unaware" whether such council was in existence  (A50 at Response No. 1).

## THE ORDER AND JUDGMENT APPEALED FROM

By opinion and order dated January 20, 2016, the United States District Court for the Southern District of New York (Román, USDJ) (SPA1-12), granted Defendants' Motion for Summary Judgment. The District Court did not reach the merits of Penn's discrimination and retaliation claims. Rather, the Court erroneously concluded that Penn's claims were barred by the Free Exercise and Establishment Clauses of the First Amendment (SPA 11). In so doing, the Court overlooked the undisputed evidence presented by Penn that in 1975 NYMH "affirmatively" abolished its alleged religious purpose, completely severed "its Christian genesis", "Church related character" and alleged relationship with The United Methodist Church and publicly proclaimed that it was a secular, non-sectarian institution (A269-70, 340, 353-54, 407, 410).

Although the District Court acknowledged that the 1975 amendment to its

19

Certificate of Incorporation "caused NYMH to sever all formal ties with the United Methodist Church [ ]and that NYMH is no longer corporately owned by the" church (SPA9), the Court nonetheless erroneously found that there were "sufficient indicia of religious affiliation to create a First Amendment issue" (SPA11).

## SUMMARY OF ARGUMENT

Such finding was in error because "sufficient indicia of religious affiliation" was not synonymous with "substantial religious character" and also because the finding was premised on the Defendants' argument that NYMH retained a "traditional affiliation" with the Methodist Church based solely on the following historic secular, humanitarian or philanthropic factors: (1) NYMH retained "Methodist" in its name after a name change in 1993; (2) its mission statement stated that it "has a historic relationship with the United Methodist and includes the objective of providing an active ecumenical program of pastoral care and conducting a clinical pastoral program" (SPA 9); (3) its Bylaws require significant representation from the United Methodist Church at all times (SPA9); (4) it hosts a pastor's clinic "several times a year, where Methodist ministers come to the hospital for a week and receive free health screenings and education about the hospital" (SPA 10); (5) it has a yearly philanthropic appeal to the Methodist churches in its community; (6) its employees were reminded during orientation that patients are human beings created in the image

20

of God; (7) NYMH has a chaplaincy program and clinical pastoral education (SPA10); and (8) the article entitled "Communicating the UM Connection to New York Methodist Hospital Employees" UMA Journal, Vol. 1, No. 8 (1994).

The District Court misapprehended the "substantial religious character" test sanctioned by the United States Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 616, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), failed to determine whether NYMH had a "substantial religious character", failed to perform a balancing test between alleged religious characteristics and secular characteristics of NYMH and failed to determine whether NYMH had a primary purpose and character that was religious. Such failures constitute a substantial error which led to the perverse decision that imbued a self avowed secular institution with the protection afforded only to "religious institutions" and entities with a "substantial religious character."

Further, the District Court erred in adopting and relying on the *orbiter dicta* in the cases of Musante, Rweyemamu, and Scharon to grant summary judgment to the Defendants because each of those cases involved an employer-defendant that was unquestionably a "religious institution" or had a "substantial religious character" whereas NYMH lacked a "substantial religious character" and also because the issues involved in those cases differed significantly from the issue in Penn's case.

Also, the District Court erred in failing to consider the evidence in the record

21

in the light most favorable to Penn, failed to give Penn the benefit of all reasonable inferences from such evidence and erred in crediting speculative and/or hearsay deposition testimony by Defendants' witnesses and the contents of the purported By-laws of NYMH when such By-laws was neither signed nor properly authenticated by any witness.

Thus, unless reversed, the opinion and order appealed from would deprive Penn of his day in court and also set a dangerous precedent that would enable NYMH to violate federal and state anti discrimination laws with impunity.

# ARGUMENT

## THE STANDARD OF REVIEW IS *DE NOVO*

This Court reviews a grant of summary judgment *de novo,* applying the same standard as a district court.  Graham v. Long Island Rail Road, 230 F.3d 34, 38 2d (Cir. 2000); Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 133 (2d Cir. 2000). "When *de novo* review is compelled, no form of appellate deference is acceptable." Zervos v. Verizon N.Y., Inc., 252 F. 3d 163 at 168 (2nd Cir. 2001) (*quoting* Salve Regina College v. Russel, 499 U.S. 225, 238, 113 L. Ed. 2d 190, 111 S. Ct. 1217 (1991).  *De novo* "review [of] a "district court's decision [], [requires this Court] to take note of [the decision], and study the reasoning on which it is based." Id. at 168.

Consequently, this Court is respectfully requested to undertake a painstaking examination of the reasoning on which the opinion and order appealed from is based.

23

# POINT I

## THE COMPLAINT WAS NOT BARRED BY EITHER THE FIRST AMENDMENT, OR RFRA[8] NOR BY TITLE VII EXEMPTION BECAUSE NYMH WAS A "PERVASIVELY SECULAR" INSTITUTION NOT A "RELIGIOUS INSTITUTION"

It is well established that the Religion Clauses of the First Amendment to the United States Constitution "bar the government from interfering with the decision of a religious group to fire one of its ministers." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 132 S. Ct. 694, 701, 181 L. Ed. 2d 650 (2012). "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." Id. at 702. In Rweyemamu v. Cote, 520 F. 3d 198, 207 (2nd Cir. 2008), this Court recognized the existence of the doctrine of ministerial exception in the second circuit and held that the "exception is constitutionally required by various

---

[8] RFRA states in relevant parts:

(a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000bb-1.

24

doctrinal underpinnings of the First Amendment." Id. at 207. *See* Hosanna-Tabor, 132 S. Ct. at 705 (agreeing that the ministerial exception exists under the First Amendment).

## A. THE BURDEN OF PROOF WAS ON THE DEFENDANTS TO ESTABLISH THAT NYMH WAS A "RELIGIOUS INSTITUTION"

Because the District Court previously determined that NYMH employed Penn in a "ministerial" capacity, *See* Penn 2013 U.S. Dist. LEXIS 142109 at *17, in order for the Complaint to be barred by the ministerial exception, or RFRA or the exemption afforded to religious institutions under Section 702 of Title VII[9], Defendants had the burden to establish that NYMH was a "religious institution." *See* Penn Id. at *19 ("For the ministerial to apply, Plaintiff must have been employed by a religious or religiously-affiliated group or institution.") *(citing* Hosanna-Tabor, 132 S. Ct. at 705-06).

As recognized by the court in Hartwig v. Albert Magnus College, 93 F. Supp. 2d. 200 at 211-12 (D. Conn. 2000), "[t]he Free Exercise Clause only shields from Court inquiry employment decisions made by churches and religiously-affiliated

---

[9]Section 702 of Title VII provides in relevant parts that "[t]his title shall not apply to ... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).

entities." *See also* <u>Hankins v. Lyght</u>, 441 F. 3d 96 at 108 (2nd Cir. 2006) (noting that RFRA affords "a limited exemption for religious organizations from compliance with neutral laws."); <u>DeMarco v. Holy Cross High Sch.</u>, 4 F. 3d 166 at 173 (2nd Cir. 1993) (finding that "Title VII expressly exempts certain religious institutions from its prohibitions upon discrimination based on religion")*(citing* 42 U.S.C. § 2000e-1(a)).

Given that the ministerial "exception operates as an affirmative defense to an otherwise cognizable claim," <u>Hosanna-Tabor</u>, 132 S. Ct. at 709 at n. 4, as the proponent of the affirmative defenses under the ministerial exception, RFRA and Title exemption, the burden of proof was on the Defendants to prove that NYMH was a "religious institution." *See* <u>Fitzgerald v. Henderson</u>, 251 F. 3d 345 at 357 (2nd Cir. 2001)(stating in a Title VII case that the employer bears the burden of proof on affirmative defense.)

**B.     COURTS APPLY THE SAME STANDARD UNDER THE FIRST AMENDMENT, RFRA AND TITLE VII TO DETERMINE WHETHER AN ENTITY IS A "RELIGIOUS INSTITUTION"**

As the District Court observed, this Court "has not addressed the extent to which "religious institution" covers organizations other than traditional churches" (SPA8). However, courts have determined that "in order to invoke the [ministerial] exception, [RFRA or the religious exemption under Title VII] an employer need not be a traditional religious organization such as a church, diocese, or synagogue, or an

entity operated by a traditional religious organization." <u>Penn,</u> 2013 U.S. Dist. LEXIS 142109 at * 19, (*quoting* <u>Hollins v. Methodist Healthcare, Inc.</u>, 474 F.3d 223, 225 (6th Cir. 2007) (alterations added). Rather, caselaw makes clear that an entity affiliated with a traditional religious group is regarded as a "religiously-affiliated" entity when such entity is involved in a "substantial religious activity and purpose." <u>St. Elizabeth Community Hosp. v. NLRB</u>, 708 F. 2d 1436 at 1441 (9th Cir. 1983) (*quoting* <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 616, 91 S. Ct. 2105 at 2113, 29 L. Ed. 2d 745 (1971)).

Similarly, in <u>Scharon v. St. Luke's Episcopal Presbyterian Hosp</u>., 736 F. Supp. 1018, 1019 (E.D. M. 1990), *aff'd* 929 F. 2d 360 (8th Cir. 1991), the district court found that a church operated hospital was "a church affiliated institution with "substantial religious character" because the hospital was operated under the auspices of the Protestant Episcopal and Presbyterian Churches and the hospital's board of directors was controlled by the two the churches.[10])(*quoting* <u>Lemon v. Kurtzman</u>, 403 U.S. at 616).

Courts apply the same standard in order to determine whether an entity

---

[10]Applying the "substantial religious character" test, the Fourth and Sixth Circuits have determined that "a religiously affiliated entity is considered a 'religious institution' for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics." <u>Hollins v. Methodist Healthcare, Inc.</u>, 474 F. 3d 223 at 225-26 (6th Cir. 2007) (*quoting* <u>Shaliehsabou v. Hebrew Home of Greater Washington, Inc</u>., 363 F.3d 299, 310 (4th Cir. 2004)).

qualifies as a "religious institution" or "religiously affiliated-institution" under the ministerial exception, RFRA or Title VII exemption cases. *See* <u>Penn</u> 2013 U.S. Dist. LEXIS 142109 at * 30 (using the same reasoning to conclude that Defendants failed to establish that NYMH was a "religious institution" under the ministerial exception and RFRA.). *See also* <u>EEOC v. Townley Eng'g & Mfg. Co</u>. 859 F. 2d 610 at n. 14 (9th Cir. 1988) (applying in a Title VII exemption case, the same analysis courts use to determine whether an entity's "character and purpose" were primarily religious under the First Amendment.). Thus, cases analyzing whether an entity qualifies as a "religiously-affiliated" entity for the purposes of the exemption under Section 702 of Title VII are germane in deciding whether an entity qualifies as a "religiously-affiliated" entity under the ministerial exception and RFRA and vice versa.

## C. STANDARD FOR DETERMINING WHETHER AN ENTITY IS A "RELIGIOUSLY-AFFILIATED" ENTITY

### 1. Balancing Test By Weighing Religious Characteristics Against Secular Characteristics

Although this Court has not had the occasion to consider the circumstances under which an entity qualifies as a "religiously-affiliated" entity for the purposes of the ministerial exception, RFRA or Title VII religious exception, other courts have done so. Several courts use a balancing test to determine if an entity is a "religiously affiliated" entity. For example, in <u>EEOC v. Kamehameha Schools</u>, 990 F. 2d 458 (9th

28

Cir. 1993) -- a Title VII religious exemption case -- the Ninth Circuit stated that:

> [E]ach case must turn on its own facts.  All significant religious and secular characteristics must be weighed to determine whether the corporations's purpose and character are primarily religious.  Only when this is the case will the corporation be able to avail itself of the exemption [under section 702 of Title VII].

Id. at 460, (*quoting* Townley Eng'g & Mfg. Co. 859 F. 2d at 618)(alteration added).

In Kamehameha, the defendant schools were established pursuant to a Will which directed that teachers at the schools be members of the Protestant religion. The action arose as a result of the schools refusal to hire a teacher because she was not Protestant. The district court "weighed the religious characteristics of the schools against their secular characteristics and concluded the schools were exempt under § 2000e-1 as religious educational institutions because the purpose and character of the schools is primarily religious."  Kamehameha, 990 F. 2d at 460 (*citing* EEOC v. Kamehameha Schools/Bishop Estate, 780 F. Supp. 1317 at 1324-26 (D. Haw. 1991).

On appeal, the Ninth Circuit reversed the district court.  In doing so, that court identified and weighed the following six factors in analyzing whether the schools qualified as religious institutions:[11] (1) Ownership and Affiliation, (2) Purpose, (3)

_____

[11]More recently, in Spencer v. World Vision, Inc., 633 F. 3d 723 (9th Cir. 2011), the Ninth Circuit revisited the question of what qualified an entity as a "religious institution" for purposes of Title VII religious exemption; the court stated that it was compelled by Townley and Kamehameha "to analyze, on a case - by - case basis, whether the "general picture" of an organization is "primarily religious," taking into account "[a]ll significant religious and secular

29

Faculty, (4) Student Body, (5) Student Activities, and (6) Curriculum. <u>Id</u>. at 461-64. The court then concluded that "the schools [were] an essentially secular institution operat[ed] within an historical tradition that include[d] Protestantism, and that the schools' purpose and character [was] primarily secular, not primarily religious." <u>Id</u>. at 463-64 (alteration added).

Also, in <u>Leboon v. Lancaster Jewish Cmty. Ctr. Assoc</u>., 503 F. 3d 217 (3rd Cir. 2007), the Third Circuit endorsed the balancing test established in <u>Townley</u>, for determining whether an entity's "purpose and character are primarily religious." That court then listed the following nine factors weighed or considered by courts to determine whether an entity qualified as a religious institution:

> (1) [W]hether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or

characteristics." <u>Id</u>. at 729. The court held that "a nonprofit entity qualifies for section 2000e-1 exemption if it establishes that it 1) is organized for self-identified religious purpose (as evidenced by Articles of Incorporation or similar foundational documents), 2) is engaged in activity consistent with, and in furtherance of, those religious purposes, and 3) holds itself out to the public as religious." <u>Id</u>. at 734. In concluding that the corporation was a "religious corporation", the <u>World Vision</u> court quoted extensively from the corporation's Articles of Incorporation, stating that "[t]he primary exclusive and only purposes for which the corporation is organized are religious ones...." <u>Id</u> at 736.

30

sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

Leboon., 503 F. 3d at 226.

## 2.    "Substantial Religious Character" Test Based On Founding And Ownership, Operation And/or Control By A Traditional Religious Organization

Although not all courts have applied the Townley balancing test to examine whether the primary purpose and character of an entity was religious, the vast majority of cases where the balancing test was not used to find that an entity was "religiously-affiliated," involved entities which the courts determined had a "substantial religious character" either because they were founded and owned, operated, and/or controlled by a church or other traditional religious organization.

For example, in Scharon v. St. Luke's Episcopal Presbyterian Hosp., 736 F. Supp. 1018 (E.D. M. 1990), aff'd 929 F. 2d 360 (8th Cir. 1991), the district court found that the hospital was "a church-affiliated institution with substantial religious character" primarily because the hospital was operated under the auspices of the Diocese of Missouri of the Protestant Episcopal Church and the Presbytery of Giddings-Lovejoy of the Presbyterian Church and its Board of Directors was controlled by said churches. Id. at 1018-19.

31

On Appeal in <u>Scharon</u>, the Eight Circuit agreed with the district court's determination that the hospital was a "church-affiliated hospital with substantial religious character" and then reiterated the fact that "[t]he hospital's Board of Directors consist[ed] of four church representatives and their unanimously agreed-upon nominees..... It's Articles of Association may be amended only with the approval of the Episcopal Diocese of the Missouri of the Protestant Episcopal Church in the United States of America and the local Presbytery of the Presbyterian Church (U.S.A.)." <u>Scharon v. St. Luke's Episcopal Presbyterian Hosp</u>., 929 F. 2d 360 at 362 (8th Cir. 1991)(citations and internal quotation marks omitted, alterations added).

Similarly, in <u>EEOC v. Catholic Univ. of Am.</u>, 83 F. 3d 455 at 457 (D.C. Cir. 1996), the court noted that the university was founded by Pope Leo XIII in 1887 as a Catholic university and that its Department of Canon Law (which the case concerned) remained "under pontifical direction and h[e]ld the canonical status of "ecclesiastical faculties." <u>Id</u>. at 457.   *See also*  <u>Hall v. Baptist Mem. Health Care Corp.</u>, 215 F. 3d 618, 621, 624-25 (6th Cir. 2000), (the parent corporation was founded by three Baptist Conventions, all of its directors must be Baptists, it was an affiliated institution of a church-affiliated hospital, had direct relationship with the Baptist church, and the college atmosphere was permeated with religious overtones.).

Likewise, in <u>Killinger v. Samford Univ.</u>, 113 F. 3d 196, 199 (11th Cir. 1997),

32

the court observed that the University was founded as a "theological" institution in 1841 by the Alabama Baptist State Convention, "its trustees are now, must be, and always have been (with one historical exception) Baptist" and Alabama Baptist Convention is the largest individual funding source for the University. *See also*, Little v. Wuerl, 929 F. 2d 944, 946 (3rd Cir. 1991)(Catholic school controlled by Catholic Diocese of Pittsburgh.); EEOC v. Presbyterian Ministries, 788 F. Supp. 1154, 1155 (W.D. Wash. 1992) (Exeter House is a retirement home owned and operated by the Presbyterian Church as a Christian retirement home.); EEOC v. Mississippi College, 626 F. 2d 477, 487 (5th Cir. 1980) (College was owned and operated by the Mississippi Baptist Convention.).

### 3. "Substantial Religious Character" Test Based Upon Specific "Religious Purpose" As Set Forth In Foundational Document

Also, courts have found an entity to have "substantial religious character" and therefore "religiously-affiliated" where such entity was formed for specific religious purpose as set forth in the entity's articles of incorporation or other foundational documents. For example, in Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F. 3d 299 (4th Cir. 2004), the court noted that ninety-five percent of the Hebrew Home's residents were Jewish; only members of the Jewish faith were members of its board of directors; and the Home operated a synagogue on its premises where

religious services were conducted two times a day by an ordained rabbi employed on a full-time basis by the Home. Id. at 301.

Though the Hebrew Home provided a secular service, the Fourth Circuit found that the Home was "religiously affiliated" primarily because it had a "substantial religious character" since "its By-Laws define it as a religious and charitable non-profit corporation and declare that its mission is to provide elder care to aged of the Jewish faith in accordance with the precepts of Jewish law and customs." Id. at 310-11 (internal quotation marks and citation omitted). The Shaliehsabou court also noted that consistent with its stated "mission, the Hebrew Home maintained a rabbi on its staff, employed mashgichim to ensure compliance with the Jewish dietary laws, and placed a mezuzah on every resident's doorpost." Id. at 301, 311. Importantly, the Shaliehsabou court noted that it did not decide "the full reach of the phrase 'religious institution.'" Id.

## D.  NYMH LACKED A "SUBSTANTIAL RELIGIOUS CHARACTER"[12]

In the case on appeal, in concluding that the First Amendment barred the Complaint, the District Court misapprehended the "substantial religious character" test approved in Lemon, failed to determine whether NYMH had a "substantial religious character," failed to acknowledge Townley's balancing test and did not weigh the alleged religious characteristics of NYMH against its secular characteristics in order to determine whether NYMH's "purpose and character [were] primarily religious." Townley Eng'g & Mfg. Co. 859 F. 2d at 618.

Rather, the District Court erroneously stated that "[c]ourts confronted with the "religious institution" issue tend to examine the extent to which the organization has religious characteristics" (SPA8). In so stating, the District Court misapprehended the Lemon "substantial religious character" test and failed to recognize the balancing test in Townley. As a result, the court incorrectly stated that its "task [was] to determine to what extent NYMH's mission and character incorporate[d] religious attributes" (SPA8-9).

In actuality, the task of the District Court was to determine, as sanctioned in Lemon, whether NYMH had a "substantial religious character." Lemon, 403 U.S. at

---

[12]It was not contended that NYMH was a "Religious Corporation Law corporation" within the meaning of § 2 of N.Y. Relig. Corp. Law.

35

616.  It is manifestly clear that NYMH lacked a "substantial religious character" when it is evaluated under the test affirmed by the Supreme Court in <u>Lemon</u> and/or the test enunciated in <u>Townley</u> and applied by the Ninth and Third Circuits in <u>Kamehameha</u>, <u>Leboon</u> and <u>World Vision</u>. That is, by weighing alleged significant religious characteristics of NYMH against its secular characteristics in order to determine whether its purpose and character were primarily religious. *See,* <u>World Vision, Inc.</u>, 633 F. 3d 723 (9th Cir. 2011) (stating that it was compelled by <u>Townley</u> and <u>Kamehameha,</u> "to analyze, on a case - by - case basis, whether the "general picture" of an organization is "primarily religious," taking into account "[a]ll significant religious and secular characteristics.") <u>Id</u>. at 729.

Having misapprehended its task as stated above, although the District Court acknowledged that the 1975 "amendment caused NYMH to sever all formal ties with the United Methodist Church" (SPA9), the District Court compounded its error by holding that "[s]evering a formal affiliation with the Church does not necessarily imply that the Hospital does not maintain *any* church-based relationship or have *any* religious characteristics" (SPA9) (emphasis added).  In essence, the District Court erroneously equated *"any* church-based relationship" and *"any* religious characteristics" to a "substantial religious character." In other words, the District Court incorrectly assumed  that *"any"* alleged church-based relationship or *"any"*

36

alleged religious characteristics was sufficient to qualify an entity as a "religiously-affiliated" entity for the purposes of the ministerial exception, RFRA or Title VII religious exemption.

As a result of the multiple errors by the District Court, it failed to determine whether NYMH had a "substantial religious character" or whether its "purpose and character was primarily religious." Rather, the District Court committed still further error by concluding -- on the basis of secular or humanitarian activities[13] of NYMH – "that NYMH continues to maintain a connection to the church and operate the Hospital with religious values" (SPA9-10).

This conclusion further misapprehends the District Court's task. It bears repeating that the task of the District Court was to determine whether NYMH had a "substantial religious character" or whether its "purpose and character were primarily religious," Not whether NYMH maintained "a connection to the church" or was operated with "religious values." *See* Lemon, 403 U.S. at 616, emphasizing that "parochial schools involve substantial religious activity and purpose." *See also* Townley, 859 F. 2d at 619 (although the owners of Townley held deeply rooted religious beliefs, "the beliefs of the owners and operators of a corporation are simply

---

[13]Such secular or humanitarian activities are listed *supra* under Summary of Argument. See also *infra* at Point 1 (D)(1) to (4).

37

not enough in themselves to make the corporation "religious" within the meaning of section 702 [of Title VII]." <u>Id</u>. at 619.

The historical facts relied upon by the District Court to conclude "that NYMH continues to maintain a connection to the church and operate the Hospital with religious values" (SPA9-10), *see* Summary of Argument *supra*, which historical facts, led the District Court to ultimately find "sufficient indicia of religious affiliation to create a First Amendment issue" (SPA11), were the sort of historical facts courts have explicitly held to be insufficient to qualify an entity as "religiously-affiliated." *See e.g.* <u>Fike v. United Methodist Children's Home of Va., Inc</u>., 547 F. Supp. 286 (E. D. Va. 1982), *aff'd*, 709 F. 2d 284 (4th Cir. 1983); <u>Kamehameha</u> and <u>St. Elizabeth Community Hosp,</u>

Like in <u>Fike</u>, <u>Kamehameha</u> and <u>St. Elizabeth Community Hosp</u>, alleged historical connection to the Methodist Church and questionable "religious values" were insufficient to make NYMH a "religiously-affiliated" entity for the purposes of the ministerial exception, RFRA or Title VII religious exemption. NYMH may have had historical ties to "Methodism" but its purpose and character were pervasively secular, not religious. *See* <u>Kamehameha</u>, 990 F. 2d at 463-64. Thus, it lacked a "substantial religious character."

38

1.      **NYMH Had A Pervasively Secular Character Not A "Substantial Religious Character"**

In St. Elizabeth Community Hosp., 708 F. 2d 1436, the court contrasted the "substantial religious character" of the parochial schools in Lemon with the secular humanitarian character of the hospital in that case and concluded that the hospital had a "pervasively secular character" stating thus:

> Unlike a church school, however, St. Elizabeth does not have a substantial religious character. Its primary purpose, like that of any secular hospital, is rather humanitarian, devoted to medical care for the sick. St. Elizabeth's principal function, unlike a parochial school, is to care and heal, not to indoctrinate and propagate Catholicism. Although the hospital is owned and operated by the Sisters of Mercy, neither their order nor the Catholic Church contribute financial support. Profession of Catholic faith is required neither of patients nor employees; 250 employees, only four are nuns. Half of those on the hospitals's Board of Directors (all of whom are selected by the Omaha Provinciate are required to be Sisters of Mercy or "Mercypersons,"[14] but no religious qualification is imposed upon the remainder as long as they subscribe to the hospital's philosophy. Crucifixes, Bibles and other religious symbols appear throughout the hospital, hospital meetings begin with prayer, and prayer is said over the public address system twice daily. But employees and patients are not required to participate in any religious service, and employees are not forced to perform any duties connected with religious services.

---

[14]A mercy person is an individual who has embraced the philosophy of the Sisters of Mercy. The hospital's nine directors presently include four Sisters of Mercy and one Mercyperson.

Elizabeth Community Hosp., 708 F. 2d at 1441. (footnote in original).

Had the District Court applied the "substantial religious character" test in this case or used the balancing test to determine whether NYMH's purpose and character were "primarily religious" it would have not only come to the inescapable conclusion that NYMH lacked "substantial religious character," it would also have found that NYMH's purpose and character was "pervasively secular." Particularly, in light of the undisputed record that NYMH was not owned, operated nor controlled by any religious institution; that its only purpose was to "establish, maintain, operate and conduct a hospital" for the provision of health care services -- a profoundly secular humanitarian service --(A269-270); that in 1975 it "affirmatively" abolished its alleged religious purpose, completely severed "its Christian genesis", "Church related character" and alleged relationship with The United Methodist Church; and thereafter publicly proclaimed that it was a secular, non-sectarian institution, affiliated with well known secular institutions under the same umbrella as NewYork-Presbyterian Healthcare System (A269-70, 340, 353-54, 407, 410).

Like the hospital in St. Elizabeth Community Hosp., the sole purpose of NYMH was to provide health care services. NYMH did not indoctrinate nor propagate Methodism. No one at NYMH, including Chaplains were mandated to perform religious rituals. Indeed, Poulos emphasized to chaplains that NYMH's

40

chaplaincy service was spiritual and not religious and insisted that chaplains inform

patients that NYMH was not a church but a hospital(A253 at ¶ 36, 437 at ¶ 14(a) and

(b)).  Clearly, NYMH's purpose and  character was primarily secular and was devoid

of any religious character.  Therefore, it could not have had a "substantial religious

character." *See*  St. Elizabeth Community Hosp., 708 F. 2d at 1441,  ("Its primary

purpose, like that of any secular hospital, is rather humanitarian, devoted to medical

care for the sick.").  *See also*, Kamehameha Schools, 990 F. 2d 458, concluding that

"the schools [were] an essentially secular institution operating within an historical

tradition that includes Protestantism, and that the schools' purpose and character is

primarily secular, not primarily religious." Id. at 463-64 (footnote omitted).

### 2.    Historical Ties To Methodism Is Not Synonymous With "Substantial Religious Character"

Consequently, it was immaterial and of no moment that NYMH retained

"Methodist" in its name, or that its mission statement stated it "ha[d] a historic

relationship with the United Methodist Church", or that its alleged Bylaws required

the Board to have significant representation from the church at all times (SPA9).

Such historical ties do not constitute a "substantial religious character." *See*  Fike v.

United Methodist Children's Home of Va., Inc., 547 F. Supp. 286 (E. D. Va. 1982),

*aff'd*, 709 F. 2d 284 (4th Cir. 1983) (concluding that the Children's Home was not a

41

religious entity under 42 U.S.C. § 2000e-1, notwithstanding the fact that the Home was founded by the Methodist Church, had historical ties over the years with the church, its board of trustees were members of the church and that "Methodist" was in its name.). *See also* Elizabeth Community Hosp., 708 F. 2d at 1441(finding that hospital had a pervasively secular character although half of those on the hospitals's Board of Directors were required to be Sisters of Mercy or "Mercypersons,); Kamehameha Schools, 990 F. 2d 463-64 (schools did not qualify for Title VII religious exemption because the schools were "secular institution operating within an historical tradition that included Protestantism").

### 3. Alleged Pastor's Clinic And Philanthropic Appeal Were Secular Humanitarian Or Charitable Activities, Not Religious

It was also immaterial that NYMH hosted a pastor's clinic for Methodist ministers or that it made yearly philanthropic appeal to Methodist churches or that it published an article -- ten years before Penn commenced his employment at NYMH -- entitled "Communicating the UM Connection to New York Methodist Hospital Employees." Such events or activities did not provide NYMH with "substantial religious character" because they were purely humanitarian or philanthropic devoid of religious connotations. There was no evidence that any Methodist pastor or NYMH employee engaged in proselytization, indoctrination or propagation of

42

Methodism or religion at any of the alleged pastor's clinic nor did the contents of the stale irrelevant article so suggest. Rather, the purpose of the clinic was to provide medical screening -- a secular humanitarian or charitable event. It is noteworthy that the clinic was supervised by Hill who was Jewish, not Methodist.

Similarly, the "philanthropic appeal" (no evidence that money was raised) was at best secular, a philanthropic or charitable event. *See* <u>Townley</u>, 859 F. 2d at 618 ("While the purpose of caring for and providing guidance for troubled youths is no doubt an admirable and charitable one, it is not necessarily a religious one") (*quoting* <u>Fike</u>, 547 F. Supp. 286 at 290).

### 4. Chaplaincy And CPE Programs Served A Secular Purpose, Not Religious

Further, the pervasively secular purpose and character of NYMH was not altered by the fact that -- like most secular hospitals -- NYMH provided chaplaincy services and had a CPE program (SPA9-10). Indeed, unlike the mission statement of the chaplaincy programs at the VA, Presbyterian Hospital and other well known secular hospitals, which contain the word "religious,"[15] it is apparent that "religious"

---

[15]It is a notorious fact that many well known secular hospitals provide chaplaincy services and CPE programs. For example: (1) VA at its NY Harbor Healthcare System runs a clinical education program and 24/7 Chaplain Service department which "offers spiritual & religious care for "Veterans, their families and loved ones and VA staff." (http://www.va.gov/services/chaplain_service.asp; A374 at pgs. 17-18 lns. 16-11, 375 at pg. 43 lns. 2-20); (2) New York-Presbyterian Hospital's chaplaincy website notes "we provide for religious, spiritual ...." (Http://www.nyp.org/clinical-services/pastoral-care); (3) Bellevue

43

was deliberately avoided from the mission statement of NYMH's chaplaincy program. To the contrary, the mission statement of NYMH's chaplaincy program does not mention "religious" but expressly stated the secular purpose and mission "[t]o see that the needs of the whole person-mind and spirit as well as body-are met" (www.nym.org) (A356). *See* Carter v. Broadlawns Medical Ctr., 857 F. 2d 448 at 455 (8th Cir. 1988) (finding that employment of a chaplain by a county owned hospital served a valid secular purpose because it enhanced the "wholistic treatment approach to patient care" consequently was constitutional), *(cert. denied*, 489 U.S. 1096, 109 S. Ct. 1569, 103 L. Ed. 2d 935 (1989)).

Also, as the District Court previously recognized, chaplaincy and CPE programs serve a secular purpose. *See Penn* 2013 U.S. Dist. LEXIS 142109 *24 (denying motion to dismiss in part because "it is certainly plausible that NYMH is not a religious institution, considering that many secular hospitals have chaplains and accredited clinical pastoral education programs."). *See also* Malyon v. Pierce County, 935 P. 2d 1272, 131 Wash. 2d 779 (Wash. Sup. Ct. 1997) (finding that a local Sheriff's Department chaplaincy program did not violate the First Amendment because it served a valid secular purpose, did not advance religion nor result in

---

Hospital, owned by New York City Health & Hospitals Corporation also provide chaplaincy services and full-time CPE program. (http://www.cpebellevue.com).

excessive entanglement). Thus, NYMH did not acquire a "substantial religious character" because of its chaplaincy and CPE programs.

### 5. Chaplain Duties Were Insufficient To Give NYMH "Substantial Religious Character"

In addition, the unsubstantiated allegations that Poulos -- an Orthodox Greek Christian -- in his capacity as the Director of the chaplaincy program reminded newly hired employees at their orientation that patients are human beings created in the image of God (SPA10), or that Penn, as part of his chaplain duties, conducted a non-denominational Easter service at NYMH and distributed Bibles (SPA 11 n. 5) were insufficient to give NYMH a "substantial religious character" or change its pervasively secular purpose and character.

In Kamehameha, the court found that the purpose and character of the schools were "primarily secular, not primarily religious," despite the fact that the schools, *inter alia*, employed a chaplain who taught religious education and the chaplain was also pastor of the Bishop Memorial Church which was located within the schools' grounds in a premises owned by the schools, where service was held every Sunday while school was in session; and religious education, including Bible stories, songs, prayer for 15-30 minutes weekly for a semester were taught to kindergarten through sixth grade students, etc. Id. at 462-64.

Similarly, in <u>Townley</u>, 859 F. 2d at 612, the mining equipment company was found not to be a "religious corporation" despite the fact that it "enclose[d] a Gospel tract in every piece of outgoing mail; it print[ed] Biblical verses on all company invoices, purchase orders, and other commercial documents; it [gave] support to various churches and missionaries; and ...held a devotional service once a week during work hours."

The record here is devoid of any evidence which suggests that NYMH had a "substantial religious character." Therefore, the District Court erred in concluding that Penn's "claims are barred by the Free Exercise Clause and the Establishment Clause of the First Amendment," (SPA11).

## POINT II

## THE DISTRICT COURT MISAPPREHENDED THE IMPORT OF THE *DICTA* IN THE CASES OF MUSANTE, RWEYEMAMU, AND SCHARON

**A.    THE DISTRICT COURT IMPROPERLY APPLIED THE *ORBITER DICTA* IN THE CASES OF MUSANTE AND RWEYEMAMU**

In granting summary judgment to the Defendants, the District Court erroneously relied on and applied *orbiter dicta* in Musante v. Notre Dame of Eastern Church, Civ. A. 301CV2352 (MRK), 2004 U. S. Dist. LEXIS 5611 (D. Conn. Mar. 30, 2004), for the proposition that "the ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employees are both considered in determining whether the exception applies" (SPA 7) as well as in Rweyemamu, 520 F. 3d at 208, that "[t]he more pervasively religious the relationship between an employee and his employer, the more salient the free exercise concern becomes" (SPA7).   Based upon the aforesaid *orbiter dicta,* the District Court concluded that "where an employee's role is extensively religious, a less religious employer may still create entanglement issues [with the First Amendment]" (SPA7).

Firstly, it is important to note that the issue before the District Court in the case on appeal was whether NYMH was a "religious institution" for the purposes of the

ministerial exception. (SPA7). Neither <u>Musante</u> nor <u>Rweyemamu</u> decided whether the employer in the respective cases was a "religious institution." Rather, the question considered in both cases was whether the plaintiff in each case was a "ministerial employee" for the purposes of the ministerial exception. Thus, the *orbiter dicta* in question were inapplicable to the circumstances of the case on appeal. Particularly in light of the fact that none of the *dicta* was expressed or used to determine the question of whether any employer-defendant in the two cases qualified as a "religious institution" or had "substantial religious character" for the purposes of the ministerial exception.

Secondly, the *dicta* in question was further inapplicable to the circumstances of the case on appeal because <u>Musante</u> and <u>Rweyemamu</u> each involved the Roman Catholic Church, a pervasively religious employer-defendant. The *dicta* in the two cases were expressed in the context of employers-defendants that were unquestionably "religious institutions."[16] In contrast, the employer-defendant in the case on appeal -- NYMH -- lacked a "substantial religious character" and was not church-affiliated.

Thirdly, and perhaps more importantly, the District Court's reliance on the

---

[16]In <u>Musante</u>, 2004 U. S. Dist. LEXIS 5611 at *1, the employer-defendant was Notra Dame of Easton Church, a Catholic Church within the Diocese of Bridgeport and in <u>Rweyemamu</u>, the employer-defendant was Roman Catholic Diocese of Norwich.

48

*dicta* in <u>Musante</u> and <u>Rweyemamu</u> to find that "where an employee's role is extensively religious, a less religious employer may still create entanglement issues [with the First Amendment]" (SPA7), clearly misapprehends the import of the *dicta* in question and constitutes a fundamental error of law. Undoubtedly, the *dicta* as expressed by the courts, can only be applied in the context of "religious institution" employer or an employer with "substantial religious character." Both *dicta* envisage the relative degree of religiousness of such employer vis-á-vis the duties of the employee.[17]

In contrast, as noted above, the question before the District Court was whether NYMH was a "religious institution." Without deciding whether NYMH was a "religious institution" or whether it had a "substantial religious character," the District Court erroneously applied the aforesaid *dicta* to conclude that "a less religious employer may still create entanglement issues" (SPA7).

In essence, the District Court implicitly concluded -- without deciding -- that such a "less religious" employer was *ipso facto* a "religious institution" or an

---

[17] For example, the "sliding scale" *dictum*, as expressed in <u>Musante</u>, 2004 U.S. Dist. LEXIS *18-19, envisaged the degree of religiousness of Notra Dame of Eston Church -- a pervasively religious institution employer-defendant -- as compared to the duties of the employee plaintiff in that case. Similarly, this Court's "[t]he more pervasively religious" *dictum* in <u>Rweyemamu,</u> contextually envisaged the relative degree of religiousness of the Roman Catholic Diocese of Norwich, which was also a pervasively religious employer-defendant as compared to the duties of the plaintiff in that case.

49

institution with "substantial religious character" for the purposes of the ministerial exception.  Contrary to the District Court's erroneous conclusion, the *dicta* as expressed in <u>Musante</u> and <u>Rweyemamu</u> cannot properly be applied to a "less religious" employer unless such "less religious" employer is unquestionably a "religious institution" or has been determined to have a "substantial religious character."

In other words, such "less religious" employer cannot create "entanglement issues" under the First Amendment jurisprudence since it is well established that entanglement issues can only be created when a "religious institution" or an entity with "substantial religious character" employs a ministerial employee.  *See* <u>Lemon</u>, 403 U.S. at 616 (stating that the "substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid.").

## B.  THE DISTRICT COURT IMPROPERLY ANALOGIZED NYMH TO ST. LUKE'S HOSPITAL IN <u>SCHARON</u>

The District Court also relied on the following statements from <u>Scharon</u>, 929 F. 2d at 362, to conclude that, "[t]hough NYMH may be primarily a secular institution, with regards to its employment of the Plaintiff, the Hospital was acting as a religious organization" (SPA 10):

50

> Importantly for our purposes, St. Luke's was acting as a religious institution as Scharon's employer, and Scharon's position as a Chaplain at St. Luke's was clergy. While St. Luke's provide's many secular services (and arguably may be primarily a secular institution), in its role as Scharon's employer it is without question a religious organization. ... It cannot seriously be claimed that *a church-affiliated hospital* providing this sort of ministry to its patients is not an institution with substantial religious character.
>
> (internal quotation marks omitted) (emphasis added)

(SPA 10-11)

Such conclusion is misplaced because, though arguably, St. Luke's hospital in Scharon may not have been a "pervasively religious institution," it certainly was a "religiously-affiliated institution" with a "substantial religious character." As the district court in Scharon noted, St. Luke's was run by the Protestant Episcopal and the Presbyterian Churches and both churches controlled its Board of Directors and the contents of its Articles of Association. *See* Scharon, 736 F. Supp. at 1018-19. Hence, the Eight Circuit agreed with the district court's conclusion that St. Luke's was a "church-affiliated hospital" with a "substantial religious character" and explicitly held that "[i]t cannot seriously be claimed that *a church-affiliated hospital* providing this sort of ministry to its patients is not an institution with substantial religious character." Scharon, 929 F. 2d at 362 (emphasis added).

Thus, St. Luke's was found to be a "church-affiliated hospital" with a "substantial religious character" primarily because it was operated and controlled by

51

two churches, certainly not because it employed a chaplain. Unlike St. Luke's, NYMH was not operated under the auspices of any church and neither the Board of Trustees of NYMH nor the contents of its Certificate of Incorporation was controlled by a church or other religious organization.

Also, unlike St. Luke's, the District Court did not determine that NYMH had a "substantial religious character." As the record demonstrates, NYMH was a self-avowed pervasively secular entity without a "substantial religious character. Therefore, the District Court committed reversible error by adopting and applying the inapposite *dictum* in Scharon to hold that "[t]hough NYMH may be primarily a secular institution, with regards to its employment of the plaintiff, the Hospital was acting as a religious organization" (SPA10).

The District Court's holding was in error because the contextual underpinning of the *dictum* it adopted from Scharon was premised on the fact, as found by the Eight Circuit, that St. Luke's was a "church-affiliated hospital" with "substantial religious character." The District Court's wholesale adoption and application of such *dictum* to NYMH, a hospital bereft of any "church-affiliation" and without a "substantial religious character" was not only misplaced but erroneously suggests that whenever a secular hospital employs a chaplain who provides chaplaincy services, such secular hospital thereby acts as a "religious institution." However, as submitted *infra* at Point

52

I (D)(4) the provision of chaplaincy related services by a hospital serves a secular purpose, not religious.

Consequently, a hospital (like NYMH) without a "substantial religious character" does not magically become a "religious" or "religiously-affiliated institution" merely because it employs a chaplain. Indeed, it is a notorious fact that well known private secular hospitals as well as government owned hospitals[18] employ chaplains who provide chaplaincy services. For instance, as submitted *infra,* the VA, Presbyterian and Bellevue hospitals each employs chaplains, but it would be untenable to suggest, as the District Court did by its adoption and application of the *dicta* in Scharon, that "[w]hile [the VA, Presbyterian Hospital, or Bellevue Hospital] provide[] many secular services. . . in [their] role as [employers of chaplains, they are] without question [] religious institution[s]." *Id.*

Accordingly, the District Court erred in adopting, relying on, and applying the aforesaid *dicta* or reasoning in Musante, Rweyemamu and Scharon *in toto* to grant summary judgment to the Defendants.

---

[18] Hospital chaplaincy and CPE programs serve a secular purpose, not religious purpose. If the purpose of chaplaincy and CPE programs was religious, it would be unconstitutional for government owned hospital to provide such services because it is well recognized that the Establishment Clause of the First Amendment "primarily proscribes sponsorship, financial support, and active involvement of the sovereign in religious activity. Grand Rapid School Dist. v. Ball, 473 U.S. 373,381, 105 S. Ct. 3216 (1985) (quotation marks omitted).

## POINT III

**THE DISTRICT COURT FAILED TO CONSIDER THE EVIDENCE IN THE RECORD IN THE LIGHT MOST FAVORABLE TO PENN AND FAILED TO GIVE PENN THE BENEFIT OF ALL REASONABLE INFERENCES FROM SUCH EVIDENCE**

This Court "review[s] a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." Allianz Ins. Co. v Lerner, 416 F. 3d 109, 113 (2nd Cir. 2005). *See also* United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("inferences to be drawn from the underlying facts... must be viewed in the light most favorable to the party opposing the motion."); Fincher v. Depository Trust & Clearing Corp., 604 F. 3d 712, 720 (2nd Cir. 2010).

In the case on appeal, the evidence presented by Penn overwhelmingly established that in 1975, NYMH "affirmatively" abolished its alleged religious purpose, completely severed "its Christian genesis", "Church related character" and alleged relationship with The United Methodist Church, publicly proclaimed that it was a secular non-sectarian institution and it was affiliated with well known secular hospitals under the umbrella of NewYork Presbyterian Healthcare System.

However, despite the fact that such evidence established that NYMH lacked

religious characteristics, the District Court concluded that there were "sufficient indicia of religious affiliation to create a First Amendment issue" (SPA11). In so doing, the District Court erroneously failed to view the aforesaid evidence in the light most favorable to Penn nor draw reasonable inferences therefrom in Penn's favor.

Rather, the District Court based its conclusion on: questionable evidence of the alleged historical ties NYMH had with the United Methodist Church; cherry-picked evidence of "active ecumenical program of pastoral care" and CPE program (SPA9) from NYMH's unquestionably secular Mission Statement; the contents of an article published in UMA Journal in 1994, approximately ten years before Penn began his employment at NYMH and the provisions of unauthenticated Bylaws purported to be NYMH's Bylaws.

## POINT IV

## THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS BASED IN PART ON INADMISSIBLE EVIDENCE

It is well settled that "[t]he principles governing admissibility of evidence do not change on a motion for summary judgment. Rule 56(e) provides that affidavits in support of and against summary judgment shall set forth such facts as would be admissible in evidence. Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244 at 265 (2nd Cir. 2009) (internal quotation marks and citations omitted).

"Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that an affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Arneauld v. Pentair, Inc. CV-113891(SJF)(ETB), 2012 U.S. Dist. LEXIS 168185 (E.D.N.Y. Nov. 26, 2012) (citing Patterson v. County of Oneida, New York, 375 F. 3d 206, 219 (2nd Cir. 2004)). Thus, "[h]earsay testimony contained in an affidavit may not be considered on summary judgment unless it would be admissible at trial pursuant to one of the exceptions to

hearsay rule." <u>FDIC v. Wrapwell Corp.</u>, 93 Civ. 859, 2002 U.S. Dist. LEXIS 76 (S.D.N.Y. Jan. 3, 2002) (excluding statement contained in an affidavit because it was not based on deponent's personal knowledge since the deponent testified at his deposition that he was not present to hear the statement personally.).

With respect to documents, "[t]he principal precondition to admission of documents as business records pursuant to *Fed. R. Evid. 803(6)* is that the records have sufficient indicia of trustworthiness to be considered reliable." <u>Saks International, Inc. v. M/V "Export Champion"</u>, 817 F. 2d 1011 at 1013 (2nd Cir. 1987). Although "[t]he trial court has broad discretion in determining whether an item of evidence has been properly authenticated,.... Under Federal Rule of Evidence 901(a), the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." <u>Scotto v. Brady</u>, 410 Fed. Appx. 355, 361 (2nd Cir. 2010)(citations, internal quotation marks alterations omitted).

Thus, courts have held that in order to be admissible, documents must be authenticated or identified by a person with personal knowledge. *See e.g.* <u>Lachira v. Sutton</u>, No. 3:05 -CV-1585, 2007 U.S. Dist. LEXIS 33250 (D. Conn. May 7, 2007) (stating that "to authenticate a document, a witness with personal knowledge to that effect need only testify that the document is what it purports to be.") (citation and internal quotation marks omitted);

57

Boniel v. U.S. Bank N.A., No. 12-CV-3809, 2013 U.S. Dist. LEXIS 16247 *7 (E.D.N.Y. Feb. 6, 2013)(finding documents inadmissible because they were not submitted with "any statement authenticating them or an affidavit or declaration attesting to their source and provenance."); Shamrock Power Sales, LLC v. Scherer, No. 12-CV-8959, 2015 U.S. Dist. LEXIS 133650 *63-5 (E.D.N.Y. Sept. 30, 2015)(granting motion to strike documents because the documents were submitted without any authenticating evidence.) (collecting cases).

In the case on appeal, in connection with their motion for summary judgment, Defendants submitted their Response to Interrogatories (A45-62, verified by Hill) which contained copious quotes from NYMH's unauthenticated By-Laws and also sought to authenticate said By-Laws by affidavit deposed to by Hill. However, Hill testified that she did not have personal knowledge of the By-Laws. Therefore, she was not in a position to authenticate same given her deposition testimony that she was not familiar with the Bylaws, had never read it and was unable to authenticate[19] same (A391 pgs. 54-55). Thus, the District Court erred in crediting the contents of the By-laws (over Penn's objections, A433 at 3(f)) more so given that the Bylaws was not sighed, executed nor properly authenticated.

Also, although Hill testified at her deposition that she had not conducted any surveys regarding chaplaincy programs at other hospitals within the City of New York (A384 pg. 27

---

[19]Poulos also testified that he was not familiar with the provisions of the By-Laws of the NYMH's (A367 at pgs. 109-110 lns. 13-19)

58

lns. 8-18), the District Court improperly credited Hill's speculative deposition testimony that the pastoral care program and clinical pastoral education programs at NYMH was more developed than that of other hospitals (SPA10).

Further, Penn began his employment with NYMH approximately ten years after the 1994 UMA Journal article was published. There was no evidence that the events or activities described in said article continued to occur at NYMH during Penn's tenure there. Despite lack of such evidence, the District Court credited the events or activities detailed in said article as evidence that NYMH maintained a Methodist "connection" (SPA10).

## **CONCLUSION**

As demonstrated above, the District Court committed multiple errors of law in granting summary judgment to the Defendants. It is therefore respectfully requested that the opinion and order as well as judgment appealed from be reversed and this case remanded to the District Court.

May 20, 2016

Brooklyn, New York

Respectfully submitted,

LAW OFFICE OF VINCENT I. EKE-NWEKE, P.C.

By: /s/ Vincent I. Eke-Nweke

Vincent I. Eke-Nweke

498 Atlantic Avenue

Brooklyn, New York 11217

(718) 852-8300

Attorney for Plaintiff-Appellant Marlon Penn

60

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENT

1.    This Appellant's Brief complies with the type-volume limitation of Fed.
R. App. P. 32(a)(7)(B) because:

It contains 12,904 words excluding those parts exempted by Rule
32(a)(7)(B)(iii).

2.    This Brief complies with the typeface requirements of Rule 32 and the
type style requirements of Rule 32(a)(6), because it has been prepared
in proportionally spaced typeface using Wordperfect Times New
Roman, font size 14.

Dated:      May 20, 2016
            Brooklyn, New York

                              LAW OFFICE OF VINCENT I. EKE-
                              NWEKE,      P.C.

                              By: /s/ Vincent I. Eke-Nweke
                                   Vincent I. Eke-Nweke
                                   498 Atlantic Avenue
                                   Brooklyn, New York 11217
                                   (718) 852-8300

                              Attorney for Plaintiff-Appellant
                              Marlon Penn

# Special Appendix

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Nelson S.
    Roman, dated January 20, 2016, Appealed From .. SPA-1

Judgment, dated January 21, 2016, Appealed From .. SPA-13

SPA-1

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
MARLON PENN                                                  :
                                                             :
                               Plaintiff,                    :        11-cv-9137 (NSR)
           -against-                                         :
                                                             :        OPINION AND ORDER
THE NEW YORK METHODIST HOSPITAL and  :
PETER POULOS,                                                :
                                                             :
                               Defendants.                   :
-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

Plaintiff, Marlon Penn ("Plaintiff") commenced the instant action against his former

employer New York Methodist Hospital ("NYMH" or the "Hospital") and his former supervisor

Peter Poulos ("Poulos") (collectively "Defendants"), seeking monetary damages for wrongful

termination.  In his second amended complaint ("Complaint"), Plaintiff asserted two causes of

action against Defendants, one for discrimination and the other based on retaliation. By Opinion

and Order, dated September 30, 2013, the Court granted Defendants' motion to dismiss to the

limited extent of dismissing Plaintiff's claims pursuant to 42 U.S.C. § 1981 for discrimination on

the basis of his race and religion as against both defendants, dismissing Plaintiff's Title VII claim

against NYMH with respect to discriminatory actions which occurred prior to November 12,

2009, and dismissing Plaintiff's claim under Title VII for discriminatory termination of

employment on the basis of race or religion.

Defendants now move, pursuant to Federal Rule of Civil Procedure 56(a), for summary

judgment on the remaining claims. Defendants assert that (a) the "ministerial exception" to

discrimination cases bars the claims asserted by this ministerial employee against his religious

institution employer, and (b) in the alternative, no reasonable jury could find for Plaintiff on his claims of discrimination and retaliation.  For the following reasons, Defendants' motion for summary judgment is granted.

## BACKGROUND

In the Complaint, Plaintiff asserts that he is an African-American, a Methodist, an ordained minister, and a Board Certified chaplain. (Compl. ¶¶ 14, 20.) Defendant NYMH, a New York not-for-profit corporation located in Brooklyn, New York, is a member of the New York-Presbyterian Healthcare System and is a non-sectarian, voluntary institution. (*Id.* ¶¶ 15–16.) NYMH has a Pastoral Care Department which is supervised by Defendant Poulos. (*Id.* ¶ 17.)

Defendants hired Plaintiff as a resident chaplain in January 2002, and then again as a Duty Chaplain in July 2004. (Plaintiff's Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1(b) ("Pl.'s 56.1"), ECF No. 108, ¶ 19.) As duty chaplain, Plaintiff worked one 24-hour weekend shift each week, from Sunday 9:00 a.m.-Monday 9:00 a.m., interacting with other chaplains for about 30 minutes on Monday mornings. (*Id.* ¶ 21.) From approximately 2004 to 2010, Plaintiff also worked a Wednesday shift. (*Id.* ¶ 22.)  Over the years, Plaintiff repeatedly made requests to Poulos for additional hours, additional shifts, or a full-time position but was denied. (*Id.* ¶ 39.)

In his role as chaplain, Plaintiff was "primarily responsible for ministry" to patients and their families, and his responsibilities—among other things—included "distribut[ing] of Bibles to all patient units," "conduct[ing] in-Hospital memorial service[s]," "maintain[ing] an active, on-going Pastoral care to staff," "providing communion to nurses," and "[conducting] Easter services, (Compl. ¶¶ 24, 29(b)–(c)). Throughout his tenure at the Hospital, Plaintiff was commended on several occasions for his excellent work performance. (Pl.'s 56.1, ¶ 28(c).)

2

SPA-3

Plaintiff was awarded letters of approbation for his attendance, and Poulos described Plaintiff as "conscientious and reliable as Chaplain on Duty, functioning well in stressful situations." (*Id.* ¶ 28(b)–(c).)

In 2010, the Catholic Chaplain, Sister Therese Camardella, retired, leaving her position open for a replacement. (*Id.* ¶ 35.) Poulos told Plaintiff that Sister Therese's position was not available to Plaintiff (who is a Methodist) because the position would only be filled by a Catholic chaplain or a nun. (*Id.* ¶ 36(a).)  Poulos contends that he attempted to replace Sister Therese with a Catholic chaplain, but when he was unsuccessful, Poulos offered the position to Chaplain Joo Hong, who Defendants believed was the best qualified applicant for the position. (*Id.* ¶¶ 41–42.) Defendants allege that Poulos did not hire Plaintiff because he did not believe Plaintiff to be an acceptable candidate to replace Sister Therese, based on the fact that he could not provide "effective coverage." (*Id.* ¶ 36.) Plaintiff instead contends that this failure to promote decision was based on racial and religious discrimination. (*Id.* ¶ 43.) Poulos never discussed with Plaintiff any alleged work performance issues or inability to provide effective coverage. (*Id.* ¶ 36(e).) Based on the foregoing, on September 16, 2010, Plaintiff filed a discrimination complaint with the New York City Commission on Human Rights ("HRC"), alleging that Defendants discriminated against him on the basis of his race and religion. (*Id.* ¶ 55.) Plaintiff, however, did not succeed on his complaint with the HRC. (*Id.* ¶ 60.)

Prior to Plaintiff's filing of the complaint in September 2010, Poulos did not counsel Plaintiff, reprimand him, write him up, or subject him to any disciplinary action on account of his work performance at any time. (*Id.* ¶ 28(a).) Defendants claim that, after 2010, Plaintiff's work performance began to deteriorate, which eventually caused Defendants to terminate Plaintiff. (*See id.* ¶¶ 67–115 (detailing issues with Plaintiff's performance).) Specifically,

3

SPA-4

Defendants allege numerous instances of misconduct, including (i) failing to log activities regarding patients, (ii) failing to fill out a priest referral card for a patient, which led to the patient's demise without receiving his last rites, (iii) interacting with an interracial couple who had just suffered a fetal demise in an insensitive and inappropriate manner, (iv) conducting an Easter service for which he was unprepared and in which he was insensitive to Catholic attendees who wished to receive communion, and (v) sexually harassing a fellow chaplain. (*Id.* ¶¶ 67–115.)

Plaintiff, however, believes that all the allegations of poor performance were "trumped up" by Defendants, and the work performance complaints were procured by Poulos in order to create a basis to fire Plaintiff. (*See, e.g., id.* ¶ 72; *see generally id.* ¶¶ 67–115.) Specifically, Plaintiff alleges that on October 7, 2010, Poulos held a meeting with the Hospital's Employee Relations Manager and Director of Employee Relations, and at said meeting it was decided that "[the Employee Relations Manager] will work with Peter Poluos[]" to procure enough data for Plaintiff's discharge. (*Id.* ¶ 64(a).) For example, Plaintiff believes that Poulos encouraged the alleged sexual harassment victim to write an incident report detailing sexually inappropriate conduct and later rewarded the victim "by retaining her to do an 'unusual' third year [clinical pastoral education] Residency and ultimately promot[ing] her from the position of student chaplain … to the position of Chaplain Manager." (*Id.* ¶ 111.) Thus, Plaintiff believes the allegations of misconduct are pretextual reasons for his termination.

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

4

law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the

absence of any genuine dispute or issue of material fact by pointing to evidence in the record,

"including depositions, documents . . . [and] affidavits or declarations," *id.* 56(c)(1)(A), "which it

believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine

dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support

the fact." Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has fulfilled its preliminary burden, the onus shifts to the

nonmoving party to raise the existence of a genuine dispute of material fact.  *Id.* 56(c)(1)(A);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A genuine dispute of material fact

exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013);

*Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v.

City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New York*, 426 F.3d 549,

553 (2d Cir. 2005).  Courts must "constru[e] the evidence in the light most favorable to the non-

moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust &

Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d

109, 113 (2d Cir. 2005)).  In reviewing the record, "the judge's function is not himself to weigh

the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249; *see also Kaytor

v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in

considering the motion for summary judgment is not to resolve disputed questions of fact."), nor

is it to determine a witness's credibility, *Anderson*, 477 U.S. at 249.  Rather, "the inquiry

performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at

5

SPA-6

250.

## DISCUSSION

Defendants assert that the "ministerial exception"—grounded in the Religion Clauses of the First Amendment—applies to this case, such that the discrimination and retaliation claims must be dismissed.

The First Amendment states in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. CONST. AMEND. 1. Recently, the U.S. Supreme Court recognized the "ministerial exception" in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 702 (2012), where the Court ruled that the First Amendment prohibits the government from interfering with a religious organization's right to hire and fire ministers. As the Court explained:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 697. Thus, the Court held that the ministerial exception "bars an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Id.* at 698.

This Court previously examined the ministerial exception as applied in the instant case on the Defendants' motion to dismiss. The Court held that (1) Plaintiff was a ministerial employee, and (2) the present dispute involves questions that would require the Court to examine Plaintiff's

spiritual functions.[1] *See Penn v. New York Methodist Hosp.*, No. 11-CV-9137 NSR, 2013 WL 5477600, at *6 (S.D.N.Y. Sept. 30, 2013). The only question remaining is whether NYMH is a "religious institution" for purposes of the ministerial exception.[2] While examining this question, it is important to note that the Court agrees with *Musante v. Notre Dame of Easton Church*, No. CIV.A. 301CV2352MRK, 2004 WL 721774, at *6 (D. Conn. Mar. 30, 2004) that "[t]he ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies." *Musante* held that "[t]he more pervasively religious an institution is, the less religious the employee's role need be in order to risk first amendment infringement." *Id.* On the other hand, where an employee's role is extensively religious, a less religious employer may still create entanglement issues. *See Rweyemamu v. Cote,* 520 F.3d 198, 208 (2d Cir. 2008) ("The more 'pervasively religious' the relationship between an employee and his employer, the more salient the free exercise concern becomes."). This Court has already explained that Plaintiff's role was

---

[1] Though *Rweyemamu v. Cote,* 520 F.3d 198, 208 (2d Cir. 2008) held that "a plaintiff alleging particular wrongs by the church that are wholly non-religious in character is surely not forbidden his day in court," the *Hosana Tabor* Court explained that, in an employment discrimination suit, it is not essential for Defendant to allege a religious reason for the adverse employment decision. Instead, the ministerial exception is broader and encompasses most employment decisions regarding "who will minister to the faithful." *See Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 132 S. Ct. at 709 ("The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter "strictly ecclesiastical," []—is the church's alone.") (internal citations omitted).

[2] Plaintiff claims that, based on a representation made in a pre-motion letter, Defendants are estopped from arguing that NYMH is a religious institution. This argument is without merit. Plaintiff was notified of the argument when Defendants moved to dismiss on the ground that the ministerial exception applied, and thus, the parties conducted discovery as to the issue. Moreover, Plaintiff had notice of the argument in Defendants' moving papers, and the pre-motion letter is not binding on either party. *See In re AutoHop Litig.*, No. 12 Civ. 4155(LTS)(KNF), 2013 WL 5477495, at *12 (S.D.N.Y. Oct. 1, 2013) (rejecting argument that defendant waived Rule 9(b) objection by failing to specify it in pre-motion letter pursuant to the court's individual practices rules as "unavailing"); *JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C.*, No. 08 Civ. 2154(VM), 2011 WL 1796298, at *3 (S.D.N.Y. Apr. 22, 2011) (holding insufficient service not waived by omitting it from pre-motion letter).

pervasively religious. Plaintiff was "primarily responsible for ministry to certain NYMH's patients and their families." (*See* Compl. ¶ 28.) In light of Plaintiff's exceedingly ministerial role, application of the ministerial exception to a less religious institution may be warranted.

According to *Hosanna-Tabor,* a religious institution for purposes of the ministerial exception is not limited to traditional churches. *Hosanna-Tabor*, 132 S. Ct. at 706. Though the Second Circuit has not addressed the extent to which "religious institution" covers organizations other than traditional churches, other courts have held that—for purposes of the ministerial exception—religiously affiliated schools, hospitals and corporations can qualify as "religious institutions." *See Shukla v. Sharma*, 2009 U.S. Dist. LEXIS 90044, *14–15 (E.D.N.Y. Aug. 14, 2009) (citing *EEOC v. Catholic Univ*., 83 F.3d 455, 461, 317 U.S. App. D.C. 343 (D.C. Cir. 1996) (church affiliated university); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989) (non-profit religious corporation). Courts confronted with the "religious institution" issue tend to examine the extent to which the organization has religious characteristics. For example, in *Scharon v. St. Luke's Episcopal Presbyterian Hosp*., a terminated hospital chaplain brought Title VII and ADEA claims against her former employer, and the court held that the chaplain fell within the ministerial exception because the hospital was acting as "an institution with 'substantial religious character.'" 929 F.2d 360, 362 (8th Cir. 1991) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 616, 91 S. Ct. 2105, 2113, 29 L. Ed. 2d 745 (1971)). Similarly, the Supreme Court—citing the Fourth Circuit— held that a "religiously affiliated entity is a 'religious institution' for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics." *Hosanna-Tabor*, 132 S. Ct. at 706 (quoting *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 310 (4th Cir. 2004)). Thus, this Court's task is to determine to what extent NYMH's mission and character incorporate

8

religious attributes.

Plaintiff contends that NYMH lost its religious character and affirmatively severed ties with the church when it amended its Certificate of Incorporation in 1975 and removed all reference to its "Church related character" and "relationship with The United Methodist Church." (*See* Pl.'s Brief, 7.) Though the Court recognizes that this amendment caused NYMH to sever all formal ties with The United Methodist Church, that fact is not dispositive of the inquiry. Severing a *formal* affiliation with the Church does not necessarily imply that the Hospital does not maintain any church-based relationship or have any religious characteristics.[3]

Defendants explain that although NYMH is no longer corporately owned by the Methodist Church, the hospital has always retained a "traditional relationship" with the church. (*See* Defs.' Brief, 16.) This is evidenced by the fact that the Hospital maintained "Methodist" in its title, despite an affirmative name change in 1993 when the Hospital affiliated with the New York Hospital. (*See* Deposition of Lyn Hill, ECF No. 101, Exhibit A, at 25:4-6.) In addition, the Hospital's mission statement explains that the Hospital has a historic relationship with the United Methodist Church and includes the objective of providing an active ecumenical program of pastoral care and conducting a clinical pastoral program. (*See* NYMH Employee Handbook, ECF No. 101, Exhibit C, at 6.) The Hospital Bylaws also require the Board to have—at all times— significant representation from the United Methodist Church. (Bylaws, ECF No. 101, Exhibit D, at 4, Art. III, Section 2(c).) Based on the foregoing and additional statements from the record, it is clear to the Court that NYMH continues to maintain a connection to the church and operate the

---

[3] For the same reason, the Court finds the NYMH statement in the publication titled "Communicating the UM Connection to Employees" that "it is no longer *formally* affiliated with a connectional unit of The United Methodist Church" unpersuasive. ("Communicating the UM Connection to New York Methodist Hospital Employees," UMA Journal, Vol. 1, No. 8 (1994), ECF No. 101, Exhibit E.)

Hospital with religious values. (*See* Deposition of Lyn Hill, NYMH Vice President of Communications and External Affairs, ECF No. 101, Exhibit A, at 24:12–19 ("We continue to have a pastor's clinic which is run several times a year, where Methodist ministers come to the hospital for a week and receive free health screenings and education about the hospital. We have a yearly philanthropic appeal to the Methodist churches in our community"; *Id.* at 26:20–22 ("Every employee when they come to orientation is reminded that the patients are human beings who are created in the image of God"); *Id.* at 26:7–11 ("We have a very rich chaplaincy program. We have a 24/7 chaplaincy program, which not necessarily the case at other hospitals. We have our own clinical pastoral education programs, which is the case at very few hospitals."; "Communicating the UM Connection to New York Methodist Hospital Employees," UMA Journal, Vol. 1, No. 8 (1994), ECF No. 101, Exhibit E (detailing how the hospital maintains its Methodist "connection" through its everyday values, financial support from the Methodist church, etc. and stating that "the Methodist influence lives on").)

Plaintiff urges the Court to ignore these indicia of religious affiliation and to hold that the Hospital is not a religious institution because the "Welcome Letter" on NYMH's website and the publication entitled "Residency Program in Internal Medicine" state that NYMH is now a secular institution. Though NYMH may be primarily a secular institution, with regards to its employment of the Plaintiff, the Hospital was acting as a religious organization. *See Scharon*, 929 F.2d at 362 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971)) ("Importantly for our purposes, St. Luke's was acting as a religious institution as Scharon's employer, and Scharon's position as a Chaplain at St. Luke's was 'clergy.' While St. Luke's provides many secular services (and arguably may be primarily a secular institution), in its role as Scharon's employer it is without question a religious organization.  …  It cannot

10

seriously be claimed that a church-affiliated hospital providing this sort of ministry to its patients is not an institution with 'substantial religious character.'"). Plaintiff argues that the Department of Pastoral Care's mission was to provide "spiritual" care, rather than "religious" care, and therefore the institution was not a religious one, even in its employment of Plaintiff. (Pl.'s 56.1, ¶ 14.) First, the Court fails to see a meaningful distinction between spiritual and religious.[4] Second, as outlined above, though NYMH employs pastors of all faiths, it maintains a connection with the United Methodist Church, and its mission statement emphasizes an "ecumenical program of pastoral care." Therefore, insofar as Plaintiff is a Methodist and was responsible—at least in part—for preaching the Christian faith,[5] the relationship between Plaintiff and NYMH (specifically, the pastoral care department) was that of a religious employee and a religious institution. This case does not present the Court, nor will the Court venture out to decide, whether this holding would apply to a religious institution's employment of a minister, pastor, or chaplain of a different faith.

In light of the foregoing, the Court finds sufficient indicia of religious affiliation to create a First Amendment issue. Therefore, Plaintiff's claims are barred by the Free Exercise Clause and the Establishment Clause of the First Amendment, and the case must be dismissed.

---

[4] Black's Law Dictionary defines "spiritual" as "[o]f, relating to, or involving ecclesiastical rather than secular matters." SPIRITUAL, Black's Law Dictionary (10th ed. 2014). Webster's Dictionary defines "spiritual" as (1) of or relating to a person's spirit, or (2) of or relating to religion or religious beliefs. *See* http://www.merriam-webster.com/dictionary/spiritual (last visited 1/15/2015).

[5] For example, Plaintiff conducted Easter services at the Hospital and distributed Bibles. (Compl. ¶ 24.)

11

SPA-12

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED, and the Complaint should be dismissed in accordance with this opinion. The clerk is respectfully directed to terminate the motion at ECF No. 93 and close this case.


Dated: January 20, 2016                                    SO ORDERED:
       White Plains, New York

                                                    NELSON S. ROMÁN
                                      United States District Judge

**SPA-13**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED 01/21/2016
```

-------------------------------------------------------X

MARLON PENN,

                              Plaintiff,                   11 **CIVIL** 9137 (NSR)

        -against-                         **JUDGMENT**

THE NEW YORK METHODIST HOSPITAL and
PETER POULOS,

                            Defendants.
-------------------------------------------------------X

        Defendants having moved for summary judgment on the remaining claims pursuant to Fed.

R. Civ. P. 56(a), and the matter having come before the Honorable Nelson Stephen Román, United

States District Judge, and the Court, on January 20, 2016, having rendered its Opinion and Order

(Doc. #111)  granting Defendants' motion for summary judgment, and dismissing the Complaint

in accordance with the opinion; and directing the Clerk to respectfully terminate the motion at ECF

No. 93 and close this case, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated January 20, 2016, Defendants' motion for summary judgment is

granted, and the Complaint is dismissed in accordance with the opinion; accordingly, the case is

closed.

**Dated:**  New York, New York
       January 21, 2016

                                  **RUBY J. KRAJICK**
                                    _____
                                      **Clerk of Court**
                  **BY:**       K. mango
                                    _____
                                      **Deputy Clerk**